**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Vito CALIENDO, Susan Barker, Salvatore Cataudella and Thomas Stathas,
Defendants–Appellants.**

**Nos. 88–2061, 88–2062, 88–2079
and 88–2080.**

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 23, 1989.

Decided Aug. 13, 1990.

J. Kenneth Lowrie, Dept. of Justice, Chicago Strike Force, Chicago, Ill., Douglas J. Wilson, Dept. of Justice, Crim. Div., Washington, D.C., Anton R. Valukas, U.S. Atty., David J. Stetler, James R. Ferguson, Victoria J. Peters, Asst. U.S. Attys., Crim. Receiving, Appellate Div., Chicago, Ill., for U.S.

Allan A. Ackerman, James J. Roche, Condon, Cook & Roche, Chicago, Ill., for Vito Caliendo.

James S. Montana, Jr., Lydon & Griffin, Chicago, Ill., Joseph N. DiNatale, Dinatale & Montemurro, River Forest, Ill., for Susan Barker.

Allan A. Ackerman, Chicago, Ill., for Salvatore Cataudella.

Robert J. McDonnell, Chicago, Ill., for Thomas Stathas.

Before CUDAHY, POSNER, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

This case deals with prostitution on credit. Appellants, along with other defen-

dants who are not before this court, were convicted in the district court under various counts of a twenty-eight count indictment. Count One, a RICO conspiracy count, alleged that the defendants conspired through a pattern of racketeering activity to conduct the affairs of an enterprise promoting prostitution in violation of 18 U.S.C. § 1962(c). Counts Two through Twenty–Six alleged various violations of the federal Travel Act. 18 U.S.C. §§ 2 and 1952.[1] Each appellant was convicted under the RICO conspiracy count. As for the substantive Travel Act counts, Vito Caliendo was found guilty under twenty two counts; Susan Barker guilty under seven counts; Salvatore Cataudella guilty under nine counts; and Thomas Stathas guilty under nine counts. This appeal challenges the propriety of those convictions.

### I.

A full exposition of the facts giving rise to the convictions below is not necessary at this stage of the discussion. Rather, a description of the "big picture" as it portrays the combined efforts of all of the individual appellants to come together to further the conspiratorial scheme will be sufficient for the majority of issues raised on appeal.

The evidence presented at trial revealed that the appellants and other defendants conspired through various means to operate houses of prostitution in the Chicagoland area. The foundation of this conspiracy—that is, the basis for the convictions below—was the fact that the conspiratorial enterprise structured itself and "influenced" others in such a manner that the patrons of the houses of prostitution were able to pay for the services rendered with Visa, Mastercharge, and American Express credit cards. The catch: neither these credit card companies nor their issuing banks permit their credit accounts to be maintained for illegal purposes. Thus, the conspiracy necessarily involved the appellants' efforts to process their credit card slips by "laundering" them through legitimate businesses or by bribing a credit card representative to permit the appellants to maintain their accounts. The fact that sexual services were exchanged for credit also necessitated, in this case, the transportation of credit card slips across interstate lines and the use of interstate telephone facilities to obtain approval for charge transactions.

Philip Caliendo, together with his brother Vito, owned and operated various houses of prostitution. Two of their establishments, the Western Health Spa and the Petite Lounge, served as the focal points for the federal investigation which culminated in the appellants' convictions. Although the Western Health Spa and the Petite Lounge differed in the manner in which they catered their services, the overall scheme was the same. The customer would enter the establishment, select a prostitute, negotiate a price and then pay for the service which was soon to be rendered. If the customer chose to pay with a credit card, the establishment would have to obtain authorization for the transaction by use of the interstate telephone wires.

Because the credit companies do not allow their accounts to be maintained for illegal purposes, however, the appellants could not simply call the credit company and obtain authorization like any other legitimate business. Rather, the conspiracy was forced to use illicit means to process their credit card slips and/or maintain their accounts. These included: the services provided by the National Credit Card Service; the infiltration of legitimate businesses; and the bribery of a credit card company representative.

The National Credit Card Service ("NCS") was formed by Thomas Gervais exclusively for the purpose of laundering

---

1. Counts Twenty–Seven and Twenty–Eight charged Michael Mundee and Anthony Philip Caliendo respectively with perjury before the Federal Grand Jury in violation of 18 U.S.C. § 1623. Both Mundee, who was granted a Judgment of Acquittal on the perjury count, and Caliendo, who was found guilty of perjury, have voluntarily dismissed their appeals from the underlying convictions. Defendant John Coppini, although he filed a Notice of Appeal, did not file a brief in support of that appeal.

illicit credit card receipts for Chicagoland strip joints and brothels. In late 1978, Gervais offered his services to the Mansion House, a Caliendo establishment which functioned as a house of prostitution. For approximately a year, Gervais provided his service to the Mansion House without a hitch. Soon thereafter, however, the relationship soured from Gervais' perspective. The Caliendos began to "pressure" Gervais into taking them on as partners in his business. When he balked, a "tax" was instituted on Gervais' business by the Caliendos because of his monetary success. Moreover, the bank which Gervais was using to process the charges from the Mansion Club discovered the Mansion Club's illegal operation and closed its account and froze the funds. Gervais was stuck with approximately $12,000 in the frozen funds which represented charges made by the Mansion Club. These were funds which Gervais would end up covering at the risk of bodily injury. He was also "invited" by the Caliendos to get out of the credit card processing business. Soon thereafter, Gervais contacted the FBI and agreed to introduce an undercover FBI agent as a partner in NCS.

The House of Kobe, a Japanese restaurant in Schererville, Indiana, was one of the legitimate businesses targeted by the conspiracy to process its illicit credit card receipts. In early 1982, Philip Caliendo approached Samuel Schultz, the owner of the House of Kobe. Caliendo informed Schultz that he had recently lost his merchant number for his American Express account and asked Schultz if he could process the receipts for his "catering, limousine and entertainment" business through Schultz's American Express account. Schultz ultimately agreed after repeated requests. Charles Swanson, an investigator for American Express, soon discovered, however, that Schultz was processing credit charges for Caliendo's houses of prostitution and closed the House of Kobe account. Unfortunately for Schultz, Swanson also froze the funds which American Express owed on the outstanding receipts, including those funds which represented the charges made at the Caliendo's houses of prostitu-

tion. After being threatened by Philip Caliendo with the prospect of having to deal with "the organization or Uncle Vito", Schultz agreed to pay out of his own pocket the amount of the Caliendo's charges which American Express refused to honor.

In February of 1983, Charles Swanson discovered that a separate business, Major's Restaurant in Lyons, Illinois, was also processing illicit receipts for the Caliendos through its American Express account. As he did with Mr. Schultz and the House of Kobe, Swanson closed Major's account. Unlike Mr. Schultz, however, the owner of Major's attempted to bribe Swanson to keep the account open by offering him the services of the prostitutes at the Petite Lounge. Swanson demurred on that offer, but agreed to accept a monthly payment in return for reopening the account and releasing the frozen funds. Swanson, who had anticipated these "offers", had contacted the FBI prior to the meeting and was wearing a body recording device on the day he met with Major's owner.

Our recitation of the "big picture" and various scattered events in the conspiratorial scheme has not painted the entire picture. Specifically, we have not given a detailed description of each of the individual appellant's involvement in the conspiratorial scheme. We have, however, provided a flavor for the manner in which the enterprise operated. For the majority of issues raised on appeal, this is sufficient. Only as they become germane to the issues raised will the individual roles of the various appellants be portrayed.

## II.

Two separate briefs have been filed on appeal. The first, a joint brief filed on behalf of all of the appellants, argues: (1) that the district court committed prejudicial error in giving the jury a "conspiracy membership" instruction different from that prescribed by *Federal Criminal Jury Instructions of the Seventh Circuit* § 5.11 (1980); (2) that the district court committed prejudicial error in giving the jury an "ostrich instruction"; and, (3) that the prejudice which resulted from certain witness

and prosecutorial statements made during the trial necessitates a reversal of the convictions. The second brief, filed individually on behalf of Susan Barker, argues: (1) that the district court erred in refusing to grant her motions for severance; and, (2) that the delivery of a *Pinkerton* instruction in this RICO conspiracy prosecution resulted in an unwarranted extension of criminal liability. We address each issue in turn.

## A. The Pattern Conspiracy Instruction

■ Over the objections of defense counsel, the district court adopted the rationale of the ninth circuit as set out in *United States v. Giese*, 597 F.2d 1170 (9th Cir.), *cert. denied*, 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979), and incorporated the following as part of its jury charge on the conspiracy count:

> In determining whether or not a particular defendant was a member of the conspiracy, you may consider the evidence of his or her conduct and actions, together with his or her own statements and declarations. You may also consider and weigh the acts and declarations of other co-conspirators which were made during the course of the conspiracy and in furtherance of it, as bearing on the question of a defendant's membership in the conspiracy.

This instruction was erroneous, appellants claim, in that it permitted the jury to consider co-conspirators' statements and actions in determining each defendant's membership in the conspiracy. Appellants argue that the district court should have adhered to *Federal Criminal Jury Instructions of the Seventh Circuit* § 5.11 (1980), which reads:

> In determining whether the defendant became a member of the conspiracy you may consider only the actions and statements of that particular defendant.

The arguments which appellants have raised on this issue have recently been addressed and rejected by this court in *United States v. Martinez de Ortiz*, 907 F.2d 629 (7th Cir.1990) (*en banc*). In *Martinez de Ortiz*, we held that the particular language which appellants urged upon the district court—i.e., the portion of § 5.11 reprinted above—is inconsistent with Fed. R.Evid. 104 and *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). In light of the thorough discussion of this issue in *Martinez de Ortiz*, we reject appellants' challenge to this instruction without further discussion.

## B. Ostrich Instruction

As a second challenge to their convictions, appellants argue that the district court committed prejudicial error in giving the jury a conscious avoidance ("ostrich") instruction. As presented to the jury, the instruction at issue reads:

> You may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a person had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet shut his or her eyes for fear of what he or she would learn, you may conclude that he or she acted knowingly, as I have used that word.

The purpose of an ostrich instruction is to expand the traditional understanding of "knowledge" for purposes of determining whether a defendant "knowingly" committed a certain act. *See United States v. Ramsey*, 785 F.2d 184, 189 (7th Cir.), *cert. denied*, 476 U.S. 1186, 106 S.Ct. 2924, 91 L.Ed.2d 552 (1986) ("[a]n ostrich instruction informs the jury that actual knowledge and deliberate avoidance of knowledge are the same thing"). The ostrich instruction is not, however, an all-purpose instruction appropriate under any circumstance. Rather, "'[a] conscious avoidance instruction is "properly given only when the defendant claims a lack of guilty knowledge and there are facts and evidence that support an inference of deliberate ignorance."'" *United States v. Diaz*, 864 F.2d 544, 549–50 (7th Cir.1988), *cert. denied*, ⎯ U.S. ⎯, 109 S.Ct. 2075, 104 L.Ed.2d 639 (1989) (quoting *United States v. White*, 794 F.2d 367, 371 (8th Cir.1986) (other citations omitted)). Finally, in assessing the propriety of an ostrich instruction in a particular case, we

review the evidence in the light most favorable to the government, *United States v. Talkington*, 875 F.2d 591, 596 (7th Cir. 1989), and reverse only upon a showing of an abuse of discretion. *United States v. Defazio*, 899 F.2d 626, 636 (7th Cir.1990).

■ The propriety of the ostrich instruction with regard to appellants Stathas and Cataudella is beyond dispute. While generally admitting their involvement in certain activities related to the conspiracy, both Stathas and Cataudella maintained at trial that they were not aware that their participation was facilitating prostitution. Indeed, each argued to the jury in his theory of defense instruction that, "[t]he defendant ... contends that he had no knowledge of the activities or purposes of the enterprise; that is, to facilitate or promote prostitution in violation of state law." This argument is the prototype of that which invites an ostrich instruction. For this reason, we reject Stathas' and Cataudella's challenge to their convictions on this ground.

■ Susan Barker, formerly a prostitute at Plato's Castle, ultimately became Philip Caliendo's live-in girlfriend. She admits that she was present on various occasions during which Caliendo and others discussed various aspects of the operation of the enterprise's prostitution establishments. Moreover, the testimony revealed that Barker was present during various transactions in which credit slips directly related to the enterprise's prostitution activities were laundered through legitimate businesses. She claims, however, that her presence on these occasions was only that of a "passive bystander." This claim is suspect in light of Barker's involvement in other facets of the conspiracy's operation, however. For example, the record revealed that Barker served as manager of RVS Books, an adult bookstore adjoining the Western Health Spa whose operation was closely affiliated with that of the Spa. In this capacity, Barker was involved in discussions with Caliendo and other spa employees about a plan to have female spa employees serve as "movie critics" for those customers who watched movies in the bookstore's video

booths. As Barker points out, however, this plan never materialized. Finally, the testimony revealed that Barker was often the recipient of business records and receipts, including credit card slips, which were taken from the Western Health Spa and RVS Books to Philip Caliendo's house on a daily basis.

Despite all of this evidence describing her involvement with members of the conspiracy, Barker's position in opening argument and throughout the trial was that she was simply the girlfriend of Philip Caliendo and the manager of a bookstore which happened to be connected to a spa/brothel. Indeed, her counsel expressly argued to the jury in his opening statement, "[y]ou won't hear any evidence in this courtroom from which you can conclude beyond a reasonable doubt that [Barker] had anything to do with knowingly violating a federal law...." Thus, although there is no express statement in which Barker denied knowledge of the conspiracy's illegal purpose, the import of her argument achieves the same result—that is, she argued that although she handled the records and receipts of an illicit business connected to the conspiratorial enterprise and managed an adult bookstore whose operation was closely affiliated with (if not subsumed by) an integral conspiratorial establishment, she did not "knowingly" violate any federal laws. We find no abuse of discretion in giving an ostrich instruction under these circumstances. *Cf. United States v. Valencia and Martinez–Valencia*, 907 F.2d 671 (7th Cir.1990).

■ The ostrich instruction is least appropriate in the case of Vito Caliendo. Together with his brother Philip, Vito Caliendo co-owned and operated the various houses of prostitution which formed the basis for the federal investigation. Although he referred to himself as a "silent partner," the evidence revealed that Vito Caliendo was extensively involved in coordinating the efforts of the various entities and persons who surreptitiously enabled his establishments to access the world of credit. Indeed, Vito was often referred to as "Uncle Vito"; the accepted connotation being

that he was the "enforcer" for purposes of collecting on the enterprise's credit card slips which the credit companies would not process because of revelations about the establishments' prostitution activities.

In light of all of this evidence, it is apparent that the district court's giving of an ostrich instruction with respect to Vito Caliendo amounted to an abuse of discretion.[2] To conclude to the contrary would ignore this court's precedent in which we have cautioned, " 'if the evidence against the defendant points solely to direct knowledge of the criminal venture, it would be error to give the [ostrich] instruction.' " *Diaz*, 864 F.2d at 550 (quoting *United States v. Manriquez Arbizo*, 833 F.2d 244, 248–49 (10th Cir.1987)); *see also United States v. Alvarado*, 838 F.2d 311, 314 (9th Cir.1987), *cert. denied*, 487 U.S. 1222, 108 S.Ct. 2880, 101 L.Ed.2d 915 (1988) ("if the evidence indicates that [the defendants] had either actual knowledge or lacked any knowledge ... then giving the [conscious avoidance] instruction was inappropriate").

The fact that the district court abused its discretion in this regard, however, does not necessitate a reversal of Vito Caliendo's convictions. " 'The danger in giving the instruction where there is evidence of direct knowledge but no evidence of avoidance of knowledge is that the jury could still convict a defendant who merely should have known about the criminal venture.' " *Diaz*, 864 F.2d at 551 (quoting *Manriquez Arbizo*, 833 F.2d at 249) (other citations omitted). That danger is not present here. Based on the evidence presented at trial, it is apparent that Vito Caliendo's convictions were not based on assumptions by the jury that he "should have known" about the criminal nature of the conspiracy. To the contrary, the evidence reveals that Vito Caliendo did know about the conspiracy's illegal purpose and, indeed, went to great lengths to bring about and protect that purpose. For this reason, we conclude that

Vito Caliendo was not prejudiced by the ostrich instruction given.

C. Trial Testimony and Closing Statements

Appellants' next argument seeks a reversal of their convictions on the grounds that they were unfairly prejudiced by certain witness testimony and prosecutorial remarks made during the course of the trial. The statements at issue can be grouped into three categories for purposes of review: (1) Thomas Gervais' statement made during the course of his direct examination that he did not want to be partners with Philip and Vito Caliendo because of their "affiliation with the outfit"; (2) references by three government witnesses, both on direct and cross-examination, mentioning the federal Witness Protection Program; and, (3) a statement made during the prosecution's closing argument describing the conspiracy as something that grew "like a cancer." In each instance, the various motions for mistrial and/or severance made on behalf of the individual defendants were denied. The objections to the remarks, however, were sustained and in certain situations limiting instructions were given.[3] Doubting the ability of the limiting instructions to cure the cumulative prejudice which allegedly resulted from these references, appellants argue that a reversal and new trial are mandated. We disagree.

The remarks to which appellants direct our attention were five single references in the course of a trial that took over a month to complete and more than 2600 pages of transcript to record. The reference to the Caliendos' affiliation with "the outfit" amounted to no more than one comment in the course of the government's direct examination of its primary witness, Tom Gervais. Indeed, except for the unsavory connotations which accompany the term "outfit", the content of the response was entirely appropriate in the context of

---

2. In this regard, we note that the record does not show that the ostrich instruction was limited to those defendants who had expressly denied knowledge of the conspiracy's illegal purpose.

3. In three of the five instances, the court and the parties agreed that it would be best to not highlight the objectionable statement by drawing the jury's attention to it through a limiting instruction.

the trial.[4] Nevertheless, in response to the appellants' objections to the use of the term "outfit", the district court ordered the reference to "outfit" stricken from the record and instructed the jury to disregard it. Moreover, the court instructed the parties that testimony regarding a witness's "state of mind" should not employ terms such as "outfit", "mafia", "syndicate" or "organized crime". Appellants point to no other instances in which this type of language was used in the course of the trial. In light of the limited nature of this single reference and the district court's efforts to cure any prejudice which may have resulted therefrom, we reject appellants' assertions that a reversal of their convictions is warranted.

■ Three isolated references were made to the fact of certain witnesses' participation in the federal Witness Protection Program; two during the government's examination of its own witnesses and one during a defense counsel's cross-examination of a government witness. Although these remarks were improper in the sense that they were "volunteered" by the witness without solicitation on the part of counsel,[5] we do not believe that these remarks, either independently or in concert with the "outfit" reference, prejudiced the appellants to such an extent as to mandate a reversal.

In response to appellants' objections to each limited reference, the district court concluded with the guidance of counsel that any action beyond striking the objectionable reference from the record—that is,

any limiting instruction to the jury on the "witness protection program"—would only highlight the remark to the ultimate detriment of the defendants. Moreover, these remarks together with the "outfit" reference amounted only to four isolated, limited references in the course of a four-week trial. In light of the passing nature of these remarks in the context of a lengthy and involved trial, and in light of the district court's careful efforts to allay any prejudice which may have nevertheless resulted from these remarks, we reject appellants' arguments that a reversal of their convictions is mandated.

■ Finally, the prosecution in its closing argument analogized the growth of the conspiracy in this case to that of "a cancer". This remark, according to appellants, was improper in that its only purpose was to inflame the passions of the jury. We disagree.

In reviewing claims of prosecutorial misconduct, we initially determine whether the challenged remark or conduct was improper. If it was, we examine that improper remark in light of the entire record to determine whether the remark deprived the defendant of a fair trial. *United States v. Mealy*, 851 F.2d 890, 903 (7th Cir.1988) (citations omitted). Today we need proceed no further than the first prong of this analysis in that the reference to "cancer" in the prosecution's closing argument was not improper in the context of this trial.

Although remarks during closing argument may not be aimed at inflaming the passions of the jury, it is entirely appropri-

**4.** As one of many racketeering acts alleged in the indictment, the government charged that Philip and Vito Caliendo conspired to obtain property from Gervais' credit operation by means of extortion. The question to which Gervais was responding when he mentioned the Caliendos' affiliation with "the outfit" sought to elicit his "state of mind" when he declined the Caliendos' "offer" to become his business partner. As the district court concluded, this line of questioning was entirely appropriate in light of the extortion charge in the indictment. *United States v. Balistrieri*, 778 F.2d 1226, 1231 (7th Cir.1985), *cert. denied*, 477 U.S. 908, 106 S.Ct. 3284, 91 L.Ed.2d 573 (1987).

**5.** The government refers in its brief to the decisions of other federal circuits in which it has

been held that the government may elicit testimony regarding a witness's participation in the Witness Protection Program when the information is sought to inform the jury of all of the benefits bestowed upon a witness in return for his cooperation. *See United States v. Panas*, 738 F.2d 278, 285 (8th Cir.1984); *United States v. Blankenship*, 707 F.2d 807, 810–11 (4th Cir. 1983); *United States v. Ciampaglia*, 628 F.2d 632, 640 (1st Cir.), *cert. denied*, 449 U.S. 956, 101 S.Ct. 365, 66 L.Ed.2d 221 (1980). The references to the Witness Protection Program in this case were not expressly sought, for this purpose or otherwise. Accordingly, we express no opinion on this evidentiary issue.

ate for the prosecutor to "impress upon the jury the seriousness of the charges" as they have been brought in the indictment. *United States v. Peco,* 784 F.2d 798, 810 (7th Cir.), *cert. denied,* 476 U.S. 1160, 106 S.Ct. 2281, 90 L.Ed.2d 723 (1986) (citing *United States v. Zylstra,* 713 F.2d 1332, 1340 (7th Cir.), *cert. denied,* 464 U.S. 965, 104 S.Ct. 403, 78 L.Ed.2d 344 (1983)). In this case, the "cancer" metaphor was entirely appropriate in light of the manner in which the conspiracy spread itself through legitimate businesses rendering them, in some instances, submissive in the face of the conspiracy's demands. For all of these reasons, we reject appellants' arguments that these statements prejudiced them to such an extent that a reversal of their convictions are mandated.

### D. Severance

Susan Barker made numerous motions before the district court asking for a severance under Fed.R.Crim.P. 14.[6] All such motions were denied. In this appeal, Barker argues that the district court erred in denying these motions and, in so doing, deprived her of a fair trial. Specifically, she argues that the "disparity of evidence" presented against her as compared to her codefendants and the violent nature of the evidence presented solely against her codefendants prejudiced the jury against her. In light of the stringent burden which must be met in securing a reversal of a district court's denial of a motion for severance, we reject Barker's challenge to her convictions on this ground.

■ A decision to grant or deny a motion to sever under Fed.R.Crim.P. 14 rests within the sound discretion of the trial court and will be not be overturned absent a clear showing of an abuse of that discretion. *United States v. Moya–Gomez,* 860 F.2d 706, 754 (7th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989). In sustaining this burden, an argument that a separate trial would have afforded a better chance for acquittal is not sufficient. Rather, a defendant wishing to successfully challenge a district court's denial of her motion for severance must show "actual prejudice"—that is, the defendant must show that she could not possibly have a fair trial without a severance. *United States v. Briscoe,* 896 F.2d 1476, 1516 (7th Cir.1990) (citations omitted); *United States v. Peters,* 791 F.2d 1270, 1300 (7th Cir.), *cert. denied,* 479 U.S. 847, 107 S.Ct. 168, 93 L.Ed.2d 106 (1986). This burden accounts for the fact that "the balancing of the cost of conducting separate trials and the possible prejudice inherent in a single trial is best conducted by the trial court...." *Moya–Gomez,* 860 F.2d at 754. Finally, in reviewing Barker's claim, we note that this circuit has long recognized a presumption in favor of conducting a joint trial for persons who have been jointly indicted, especially in situations such as this where the indictment charges a conspiracy. *United States v. Echeles,* 352 F.2d 892, 896 (7th Cir.1965); *United States v. Percival,* 756 F.2d 600, 610 (7th Cir.1985); *Briscoe,* 896 F.2d at 1516. The rationale supporting this preference was summarized in *United States v. Buljubasic,* 808 F.2d 1260, 1263 (7th Cir.), *cert. denied,* 484 U.S. 815, 108 S.Ct. 67, 98 L.Ed.2d 31 (1987), wherein we stated:

> There is a strong interest in joint trials of those who engaged in a criminal enterprise. Joint trials reduce the expenditure of judicial and prosecutorial time; they reduce the claims the criminal justice system makes on witnesses, who need not return to court for additional trials; they reduce the chance that each defendant will try to create a reasonable doubt by blaming an absent colleague, even though one or the other (or both) undoubtedly committed a crime. A joint trial gives the jury the best perspective on all the evidence and therefore increases the likelihood of a correct outcome.

We realize, of course, that the presumption in favor of joint trials may not overshadow

---

6. Fed.R.Crim.P. 14 provides, in pertinent part:
   If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or informa-

tion or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

the need to ensure that each defendant receives a fair trial. *Peters*, 791 F.2d at 1302. With respect to Susan Barker, however, we do not believe that the former has jeopardized the latter, for she has failed to demonstrate "actual prejudice" from the district court's denial of her motions for severance.

■ Barker alleges that the jury was prejudiced in its consideration of the charges brought against her by a "spill-over" effect from the substantial evidence presented solely against her codefendants. We have previously noted, however, that a simple "disparity in the evidence" will not suffice to support a motion for severance— i.e., it does not independently establish "actual prejudice". *Moya–Gomez*, 860 F.2d at 754–55. Although the evidence presented against her co-defendants was more substantial than that presented against her, the evidence supporting her individual convictions was sufficient. As we noted in *United States v. Herrero*, 893 F.2d 1512 (7th Cir.1990), evidence to support a conspiracy conviction need not be overwhelming:

> 'Once a conspiracy is shown to exist evidence that establishes a particular defendant's participation beyond a reasonable doubt, although the connection between the defendant and conspiracy is slight, is sufficient to convict.... [M]ere association, knowledge or approval of a conspiracy is not sufficient to prove a defendant's guilt. However, while "mere presence at the scene of the crime or mere association with conspirators will not themselves support a conspiracy conviction ... presence of a single act will suffice if the circumstances permit the inference that the presence or act was intended to advance the ends of the conspiracy." '

*Id.* at 1532 (quoting *United States v. Xheka*, 704 F.2d 974, 988–89 (7th Cir.1983) (oth-er citations omitted)). The jury in this case was presented with evidence which permitted the inferences referred to in *Herrero*. Moreover, the jurors were properly instructed by the trial court that they had an obligation to "give separate, personal consideration to the case of each individual defendant and to separate each charge against him or her." Absent a showing to the contrary, jurors are presumed capable of adhering to the mandate of this instruction. *See Briscoe*, 896 F.2d at 1517–18. In light of these instructions, and the evidence which was presented against Barker at trial, we conclude that no "actual prejudice" jeopardizing the fairness of her trial resulted from the disparity in evidence presented as between her and her codefendants. *See Moya–Gomez*, 860 F.2d at 754–55.

Barker's second contention in this regard is that the acts and threats of violence described in the evidence presented against her codefendants prejudiced the jury against her. Although focusing on a different aspect of the evidence presented at trial, this argument must fail for the same reasons as her "disparity of the evidence" argument. The jury, which we presume capable of following instructions, was charged to consider the evidence presented against each defendant individually. Barker has pointed to nothing in the jury's deliberations or verdicts which would lead us to believe that the jury did not follow this instruction. Accordingly, we reject Barker's contention that she was "actually prejudiced" by the district court's denial of her motions for severance.

### E. Pinkerton Instruction

■ Over defense counsel's objections, the district judge instructed the jury regarding the potential for coconspirator liability under *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).[7] Barker argues that the tender of

---

**7.** As tendered, the *Pinkerton* instruction reads:

If you find that a particular defendant is guilty of conspiracy as charged in Count One, you may also find that defendant guilty of a substantive offense as charged in Counts Two through Twenty-six of the indictment, provided that you find that the essential elements of that count ... have been established beyond reasonable doubt, and provided that you also find beyond reasonable doubt:

*First,* that the offense defined in the substantive count was committed by one of the defendants pursuant to the conspiracy, and

this instruction amounted to reversible error in this RICO conspiracy case in that it resulted in an unwarranted extension of criminal liability on the substantive Travel Act counts under which she was charged. We find no merit to this argument.

Barker's challenge is not to the form of the *Pinkerton* instruction; that which was given properly recites the elements of the *Pinkerton* doctrine and permits the jury discretion in employing the doctrine as to each defendant. *See United States v. Manzella,* 791 F.2d 1263, 1268 (7th Cir. 1986). Rather, Barker's challenge is to the impact which this instruction allegedly had on the jury's verdict on the Travel Act counts. Specifically, Barker cites language from this court's decision in *United States v. Neapolitan,* 791 F.2d 489 (7th Cir.), *cert. denied,* 479 U.S. 940, 107 S.Ct. 422, 93 L.Ed.2d 372 (1986),[8] and argues, in light of an alleged lack of evidence on the Travel Act counts, that the *Pinkerton* instruction resulted in an unwarranted extension of criminal liability in her case. We have already concluded that the evidence with regard to the Travel Act counts was sufficient to support her convictions when viewed in the light most favorable to the government. In light of this conclusion, we fail to see how the *Pinkerton* instruction jeopardized any evidentiary determinations made by the jury.

### III.

For all of these reasons, the convictions entered by the district court below are AFFIRMED.

---

*Second,* that the defendant under consideration was a member of the conspiracy at the time the substantive offense was committed.
Thus, under the conditions just defined, individual participation in the acts constituting the offense as defined in the substantive count is not necessary.

**8.** Barker cites *Neapolitan* for the proposition that the use of a *Pinkerton* instruction in the RICO conspiracy context should be undertaken with constraint. 791 F.2d at 504–05 n. 7.