**UNITED STATES of America,**
**Plaintiff–Appellee,**

**v.**

**Douglas D. CRABTREE and Patrick H. Cray, Defendants–Appellants.**

**Nos. 90–2165 & 90–2166.**

United States Court of Appeals, Seventh Circuit.

Argued April 29, 1992.

Decided Nov. 18, 1992.

Rehearing and Rehearing In Banc Denied Jan. 21, 1993.

Patrick J. Chesley, Asst. U.S. Atty. (argued), Office of the U.S. Atty., Springfield, Ill., for U.S.

Gordon W. Gates (argued), James R. Potter, Londrigan, Potter & Randle, Springfield, Ill., for Crabtree.

John H. Long, W. Scott Hanken (argued), Long, Morris, Myers & Rabin, Springfield, Ill., for Cray.

Before FLAUM and KANNE, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

KANNE, Circuit Judge.

Douglas D. Crabtree and Patrick H. Cray were convicted on three counts of misapplication of bank funds, one count of conspiracy to misapply bank funds, and two counts of interstate transportation of goods obtained by fraud. Each was subsequently sentenced to one ten-year prison term, two consecutive five-year prison terms which would run concurrent to the ten-year term, and three concurrent five-year probation terms. They were also ordered to "jointly and severally" pay restitution in the amount of $1,624,308. For the following reasons, we affirm the defendants' convictions but remand for resentencing.

## I.

Right from its start, the Auburn Grain Company was wallowing in dire financial straits. Its checking account at the State Bank of Farmersville (Bank) was regularly overdrawn, oftentimes for sums exceeding $100,000. And although Auburn Grain had—at least for a short while—managed to postpone the inevitable by negotiating with the Bank to treat these overdrafts as "loans," by 1983 it had finally painted itself into a proverbial corner: its line of credit with Ralston Purina showed a past due balance of approximately $50,000; it had less grain inventory than it had sold; and its records revealed that all its assets were fully pledged and mortgaged to creditors. Auburn Grain was on the brink of financial collapse.

To protect their investment interests in Auburn Grain, Ralston Purina and the Bank agreed to form a new corporation, the Atwater Grain Company, to purchase Auburn's grain elevators and maintain its business. Crabtree, then a vice-president and loan officer at the Bank, was responsible for negotiating the buyout and was designated the acting president of Atwater Grain during the deal's preliminary stages. Pursuant to the terms of the buyout, Ralston Purina loaned defendant Cray—a personal friend of Crabtree, as well as a part owner of Auburn Grain—$187,000 to buy one-half of the issued stock of Atwater, while the other half was bought by the Bank. The remainder of the purchase price was covered by a Small Business Administration loan of $600,000, arranged by both the Bank and the First National Bank of Belleville, Illinois. Once the deal was finally closed, Crabtree resigned from his position at Atwater Grain, and Cray stepped in as president.

As it would turn out, the Atwater Grain Company proved no more profitable than its predecessor. However, it could no longer turn to the Bank for funds since its loan limit was tapped. Both Cray and Crabtree stood to lose a lot if Atwater Grain went under, so they concocted the following scheme to circumvent the Bank's loan limitations and acquire the much needed capital: they simply solicited other people—friends, relatives, and acquaintances from work—to take out additional loans from the Bank, with the verbal understanding that the proceeds would be diverted to the Company. Atwater Grain and/or the defendants personally guaranteed repayment of each of these "nominee" loans, and likewise agreed to pay each nominee any interest payments due the Bank. Needless to say, obtaining approval on these loans was

an easy matter, for Crabtree had complete control over every loan application as loan officer for the Bank. And Crabtree could also use his position to keep the Bank in the dark as to the real purpose of each loan's proceeds.

The defendants executed a substantial number of these nominee loan transactions, but for the sake of brevity we only recount those which are relevant to this appeal: [1]

*James Mathes.* This transaction took place in September 1983, just before the Atwater Grain deal was fully negotiated. At the request of Cray, James Mathes—the bookkeeper/accountant of Auburn Grain— took out a loan of $45,320.53 from the Bank. Mathes had informed the defendants that he had no assets and a negative net worth, but they told him not to worry as they would pay any of the principal or interest on the loan. Naturally, Mathes was uneasy, so he and the defendants executed a formal indemnification agreement to protect him from his obligation to the bank. As promised, Mathes then applied the proceeds of the loan to Auburn's overdraft at the Bank, which had to be paid before the sale of the elevators to Atwater Grain could be completed. Mathes' loan was later extended by Crabtree twice— once in December, 1983 and again in July, 1984—with Atwater Grain paying the interest owed at that time. But no other payments followed. Atwater Grain and the defendants later defaulted on their agreement to cover the debt and Mathes was eventually forced to file for bankruptcy when he could not repay it.

*Mike Cray.* Mike Cray was defendant Cray's brother. The defendants talked him into borrowing $100,000 from the Bank for Atwater Grain's benefit, and in return for investing it in the company, he was issued $100,000 in Atwater stock. Defendant Patrick Cray paid the interest on this loan on one occasion and made a $10,000 payment towards the principal. But, as in Mathes' case, the balance of principal and interest on the loan was not forthcoming from ei-

ther of the defendants or Atwater Grain, contrary to what both had promised. The Bank lost $9,335 in interest, and it was estimated that it would lose an additional $40,000 in principal, since Mike Cray had insufficient assets to pay off the loan.

*Mike Schafer and Don Arnett.* In March 1984, an $83,500 loan was taken out at the Bank in the name of Michael Schafer, an Atwater Grain employee. He was asked by the defendants to take out a loan in his name and to use the proceeds to purchase Atwater stock that was being held by the Bank. He, like the other nominees, was told that he would not have to repay the loan or any interest on it. Fortunately for Schafer, the defendants fulfilled half of their promise on this occasion— Atwater Grain did eventually repay the entire principal of the loan. However, $2,849.23 in interest remains unpaid.

Another $83,500 loan was taken out at the Bank in the name of Don Arnett, also an Atwater Grain employee. The facts with respect to this loan are the same as those for the Schafer loan except that the Bank was not repaid $47,000 in principal and $5,346.17 in interest. Arnett was later sued by the FDIC and settled the matter by paying $2,000.

*Curry Ice and Coal, Inc.* James Curry served on the Board of Directors of Atwater Grain, and was also the President and majority shareholder of Curry Ice and Coal, Inc. Knowing Curry to be a man of substantial means, Crabtree and Cray approached him regarding Atwater Grain's financial difficulties. They asked him to take out a loan of $140,000 from the Bank and to turn the proceeds over to Atwater, who would repay the loan from money received from Grain sales. Curry agreed and Crabtree gave his approval of the loan; once the note was executed, Atwater deposited $140,000 in Curry Ice's account, and simultaneously Curry issued a check for the same amount to Atwater. But in the ensuing months neither Curry or his

---

**1.** The Mathes and Mike Cray transactions are relevant here insofar as they are overt acts alleged in Count 1, charging conspiracy to misapply bank funds. The Schafer, Arnett and Curry Ice transactions were also alleged as overt acts in Count 1, but were additionally charged substantively as misapplication in Counts 2, 3, and 4.

company ever received any payments from Atwater or the defendants, so Curry Ice ended up paying over $200,000 in principal and interest.

*Isabelle Harmon and James Ericksen.* During October 1984, Atwater Grain was experiencing cash flow problems even though the volume of business was good. Worried about the health of the business, Cray answered an advertisement for a consulting service and was put in contact with James Ericksen, a CPA who worked in Arizona. Ericksen agreed to travel to Illinois to provide consulting services to Atwater, in return for transportation costs and a $5,000 consulting fee.

Ericksen visited the Atwater facilities four times. At the conclusion of his final visit, he prepared a consultant's report in which he recommended that Atwater Grain sell more stock and find a source for long-term funding. The defendants asked Ericksen to help them in their hunt for such a source, and after several months he suggested the name of his friend Isabelle Harmon, an income beneficiary of a trust left by her deceased husband, with the Mormon Church as the remainderman. Harmon and the Mormon Church had agreed to make Atwater Grain a $300,000 loan, based upon Ericksen's research concerning Atwater Grain. Unfortunately, the information that the defendants provided Ericksen in formulating his report was markedly lacking in one important respect: Atwater's audited financial statement—a statement which Ericksen heavily relied on when making his assessments—did not include a large number of the nominee loans. This missing information would have produced a debt to equity ratio of 3 to 1, an unacceptable ratio for investing—as opposed to the 1.5 to 1 ratio Ericksen had estimated based on his research.

With the $300,000 from the Harmon Trust, the defendants set out to repay some of the nominee loans that had become overdue. But they spent the money very rapidly, and within days they called Ericksen and told him that the company was out of money and needed more. Ericksen responded by asking for a breakdown showing how the money was spent, which indicated that $180,000 had been used for debt reduction and $120,000 for operating expenses. After considerable thought, Ericksen squeezed another $50,000 out of the Trust, believing that its original investment might be at risk if such money was not advanced. However, as it would turn out, this extension proved only to be throwing good money after bad—by February 23, 1985, Atwater Grain had been closed by the Department of Agriculture.

It should come as no surprise that, as a result of the above transactions, the Bank failed in August, 1985. The defendants were ultimately indicted for bank fraud on February 22, 1989. Specifically, the first six counts of the indictment charged each of them with conspiracy to misapply bank funds in violation of 18 U.S.C. § 371, three counts of misapplication of bank funds in violation of 18 U.S.C. § 656, and two counts of interstate transportation of property obtained by fraud in violation of 18 U.S.C. § 2314. Alleged as overt acts in the conspiracy count were the transactions with Mathes, Mike Cray, Schafer, Arnett, and Curry Ice; the loans to Schafer, Arnett, and Curry Ice were also charged as independent violations of 18 U.S.C. § 656. Additionally, Cray alone was charged in the seventh count with check kiting in violation of 18 U.S.C. § 1344.

After twenty-two days of trial, the jury returned verdicts of guilty on all counts. The district judge then sentenced each of the defendants to one ten-year prison term, two consecutive five-year prison terms which would run concurrent to the ten-year term, and three concurrent five-year probation terms; Cray was also sentenced to a five-year probation term for check kiting. In addition, each was ordered to "jointly and severally" pay restitution of $674,308 to the Bank, $380,000 to the Belleville National Bank, $120,000 to the State Bank of Virden, $100,000 to the State Bank of Girard, and $350,000 to Isabelle Harmon. No explanation was offered by the court, or indeed suggested by the prosecution, as to why the awards to the Virden, Belleville and Girard banks were considered by the court in sentencing, since each involved

transactions for which the defendants were never indicted.

## II.

■ The government now concedes that the trial judge erred in sentencing the defendants based on several allegedly fraudulent loans for which they were never charged or convicted. *See United States v. Kane,* 944 F.2d 1406, 1414–15 (7th Cir. 1991). Specifically, the jury never found the defendants guilty of the overt acts related to loans concerning Donna Cray ($97,000), Harold Walker ($85,000), and William Giberson ($85,000), and a participation sold to the State Bank of Virden ($120,000). Needless to say, this miscalculation—which accounted for $241,332 of the restitution ordered by the trial court—directly (and indirectly) affected the trial judge's sentencing on six of the seven counts, both as to length of imprisonment and the aggregate amount of restitution. *See United States v. Briscoe,* 896 F.2d 1476 (7th Cir. 1990).

The government also concedes that it is "not improbable" that the district judge failed to consider the defendants' financial resources, needs and earning ability in determining their sentences as required by 18 U.S.C. § 3664(a). *See United States v. Studley,* 892 F.2d 518 (7th Cir.1989). It likewise properly concedes that the district judge failed to comply with Fed.R.Crim.P. 32 in not determining disputed amounts relating to restitution. We must therefore remand the case for resentencing. On remand, the district judge should give attention to Rule 32 and 18 U.S.C. § 3664(a) in determining restitution, and also consider anew the defendants' sentences of imprisonment on each count. *See United States v. Shively,* 715 F.2d 260, 269 (7th Cir.1983), *cert. denied,* 465 U.S. 1007, 104 S.Ct. 1001, 79 L.Ed.2d 233 (1984). With this in mind, we now turn to the defendants' challenges to their convictions.

## A.

The defendants initially contend that the government failed to present sufficient evidence that they misapplied bank funds in violation of 18 U.S.C. § 656.[2] They face a heavy burden in so arguing: the evidence admitted at trial must be viewed in the light most favorable to the government, and a conviction will be reversed only if no rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *United States v. Johnston,* 876 F.2d 589, 593 (7th Cir.), *cert. denied,* 493 U.S. 953, 110 S.Ct. 364, 107 L.Ed.2d 350 (1989). The evidence need not be inconsistent with every reasonable hypothesis of innocence as claimed by the defendants. *United States v. Moya,* 721 F.2d 606, 709–10 (7th Cir.1983), *cert. denied,* 465 U.S. 1037, 104 S.Ct. 1312, 79 L.Ed.2d 709 (1984).

As the defendants correctly point out, the government must prove five things beyond a reasonable doubt to establish a violation of § 656: (1) that the defendant was a bank officer or director; (2) of a federally insured bank; (3) that the sum so misapplied exceeds $100; (4) that the defendant willfully misapplied funds of the bank; (5) with the intent to injure or defraud the bank. *United States v. McCright,* 821 F.2d 226, 230 (5th Cir.1987). The first three elements were stipulated, leaving at issue only the willful misapplication and the defendants' intent to injure or defraud the Bank. The defendants now argue that the willful misapplication element was not met with respect to the loans made to Mathes, Schafer and Arnett. By their story, these transactions were not loans but merely "bookkeeping transfers" that did not result in any money leaving the Bank. As such, they assert that no funds were ever misapplied and therefore their convictions must be reversed.

■ It is important to note at the outset that the defendants' argument fails to dis-

---

**2.** Although he was not the party who actually misapplied bank funds, Defendant Cray certainly qualifies as an aider and abettor and thus can be convicted if the principal actor—Defendant Crabtree—meets each element of the crime charged. The record shows that Cray shared Crabtree's intent to mislead the Bank about the true financial condition of Atwater Grain, and he was also instrumental in recruiting Atwater employees to serve as nominees.

tinguish between the conspiracy count and the other substantive counts alleged against them. Essentially, they are trying to establish that the overt acts alleged in the conspiracy count (which include the Mathes, Schafer, Arnett, and Curry Ice transactions) were not substantive violations of the misapplication statute. But this is simply the wrong approach. It has long been the law of this circuit that overt acts do not have to be substantive crimes themselves. *Yates v. United States,* 354 U.S. 298, 334, 77 S.Ct. 1064, 1084, 1 L.Ed.2d 1356 (1957), *overruled on other grounds, Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). Rather, the relevant inquiry with respect to the conspiracy count is merely whether the overt acts were in furtherance of the defendants' conspiracy to misapply the Bank's funds.

In light of the above, we believe few would question that the Mathes, Schafer, Arnett, and Curry Ice loans were completed in furtherance of the defendants' conspiracy. Nominee loans are generally used to circumvent the law, and the two made to Schafer and Arnett are no exception. The loan proceeds from these transactions were used to purchase Atwater stock at $1,000 a share, when in fact the actual value of such stock was very questionable; indeed, the reason the Bank owned the stock in the first place was because the market was unwilling to pay that price at the closing of the grain elevators' deal only three months earlier. A bona fide sale of the stock—or even the lack of such a sale—would have alerted the Bank as to Atwater's poor financial condition, rather than covering it up as the Schafer and Arnett transactions did.

As for Mathes, the two loan extensions made to him were critical in preventing the detection of the defendants' other sham loans; a default would have led to an investigation by state and federal bank regulators, which would have revealed the questionable financial condition of Atwater Grain. Again, once that threshold had been breached, it would be only a matter of time before the conspiracy to defraud the Bank was discovered. Finally, in approv-

ing the loan to Curry Ice so that Atwater ultimately could receive the proceeds, Crabtree attempted to further circumvent the Bank's loan limitations. We therefore find that the overt acts alleged in the conspiracy count are sufficient to uphold the defendants' conviction thereon.

■ However, our disposition of the conspiracy count still leaves unresolved the defendants' challenge to the substantive offenses of misapplication involved with the Schafer and Arnett loans. The government acknowledges that no money ultimately "left" the Bank on account of these transactions, since the purchase price of the stock simply went back into the Bank's coffers. But it is not necessary for the funds to actually leave the Bank for a misapplication to occur in the first place. Rather, the substantive offense of misapplication only requires that a Bank, at least temporarily, lose the possession, control or use of its funds. *United States v. Olson,* 825 F.2d 121, 122 (7th Cir.1987); *United States v. Michael,* 456 F.Supp. 335, 340–41 (D.N.J.1978), *aff'd* 605 F.2d 1198 (3rd Cir. 1979). Here, the Bank certainly lost control of its funds to Schafer and Arnett, for they were under no legal obligation to purchase Atwater stock with the money they borrowed. For that matter, the Bank could not really be said to have controlled these funds in any meaningful way. Its Board approved the extensions solely on the basis of Crabtree's recommendation—a recommendation that conveniently omitted any material information on the state of Atwater's true financial condition.

■ The defendants alternatively contend that evidence at trial did not prove that they acted with the intent to defraud or injure the Bank—the final element of a Section 656 violation. In a nutshell, they assert that they had no financial interest in any of the nominee loans, and that in any event, they were not trying to harm the bank. The defendants further argue that Curry Ice's ability to repay its loan indicates that it was not intended to injure or defraud the Bank. We disagree with both of these arguments.

The evidence overwhelmingly demonstrates that both defendants were, at one time or another, officers of Atwater Grain, and that both had personally invested money in Atwater as well as guaranteed some of its obligations. And the fact that the defendants did not possess a subjective desire to harm the Bank is irrelevant. It is well settled that the intent required to sustain a misapplication conviction is minimal. *United States v. Bruun,* 809 F.2d 397, 408 (7th Cir.1987). As we pointed out in *Bruun,* "it is sufficient that the loan officer engaged in acts, the natural tendency of which would be to injure the bank." *Id.* The nominee loans at issue here culminated in major losses by the Bank, and to that extent they certainly illustrated the requisite injurious tendency—not to mention the role that such losses inevitably must have played in the Bank's demise. Regardless of the ability of Curry Ice to repay its loan, the defendants' use of a third party to secure a loan that ultimately benefitted Atwater, or in effect their own personal interests, supports a finding of the requisite intent to defraud or injure the Bank. *See United States v. Bailey,* 859 F.2d 1265, 1281 (7th Cir.1988), *cert. denied,* 488 U.S. 1010, 109 S.Ct. 796, 102 L.Ed.2d 787 (1989). We therefore hold that the evidence presented at trial was sufficient to sustain the defendants' convictions on counts 2, 3, and 4 under Section 656.

■ The defendants also challenge their convictions under counts 5 and 6 of the indictment, which charged them with interstate transportation of property obtained by fraud in violation of 18 U.S.C. § 2314. To obtain a conviction under Section 2314, the government must prove (1) interstate transportation, (2) of fraudulently obtained property, (3) with fraudulent intent. *United States v. Freeman,* 619 F.2d 1112, 1118 (5th Cir.1980). According to the defendants, no evidence was presented which established that they made a material misrepresentation of fact to the Isabelle Harmon Trust, or that the trust relied on any representation they made to begin with. However, once again, the record undercuts all these assertions. Eriksen specifically testified that, although the defendants had

the opportunity to do so, they never told him of Atwater Grain's obligations to repay the nominee loans. Moreover, the financial statement provided to Eriksen likewise failed to mention $80,000 of Atwater debt owed to Crabtree. Such omissions most certainly qualify as material, thereby justifying the defendants' convictions on both counts.

### B.

The defendants next mount a barrage against several of the government instructions that were submitted to the jury. We review each of these challenges in turn.

■ *Instruction 30.* The defendants object—for the first time on appeal—to that part of Instruction 30 which states "[i]ntent to defraud exists when a bank officer or employee takes financial advantage of his confidential relationship with the bank." According to the defendants, this language improperly suggests that intent to defraud is a mandatory, rather than a permissive, inference that can be reached simply on the basis of the finding that the confidential relationship was abused for a bank employee's financial gain. However, because the defendants failed to raise this objection at trial, they have failed to preserve error on the question, Fed.R.Crim.Pro. 30, and therefore can only prevail if plain error occurred. Fed.R.Crim.Pro. 52(b). Plain error exists only if an allegedly inappropriate instruction undermines "the fundamental fairness of the trial and contribute[s] to a miscarriage of justice." *United States v. Young,* 470 U.S. 1, 16, 105 S.Ct. 1038, 1047, 84 L.Ed.2d 1 (1985). There was no plain error here. As we have already discussed, the intent required for a misapplication violation is minimal, and we have repeatedly defined "intent to defraud" as taking financial advantage of a confidential relationship. *United States v. Bates,* 852 F.2d 212, 215 (7th Cir.1988); *United States v. Holland,* 831 F.2d 717, 720 (7th Cir.1987); *United States v. Angelos,* 763 F.2d 859, 861 (7th Cir.1985). Hence the instruction was properly given.

■ The defendants also target that part of Instruction 30 which provides that "[i]ntent to defraud exists when a bank officer or employee ... acts with reckless disregard for the interests of the bank." Expressly relying on the Fifth Circuit's decision in *United States v. Adamson*, 700 F.2d 953 (5th Cir.), *cert. denied*, 464 U.S. 833, 104 S.Ct. 116, 78 L.Ed.2d 116 (1983), they argue that it was improper to equate intent to defraud with reckless disregard, and that the jury should have been instructed that intent to defraud may only be *inferred* from reckless disregard. Their reliance is misplaced. Quite simply, *Adamson* is a minority view which has been rejected by this court and a host of others—a fact which even the *Adamson* court itself recognized when it classified this circuit as one where "reckless disregard by a bank official of his bank's interest is sufficient to establish the requisite intent to defraud." *Adamson*, 700 F.2d at 960 (quoting *United States v. Larson*, 581 F.2d 664, 667 (7th Cir.1978)). *See also United States v. Hansen*, 701 F.2d 1215, 1218 (7th Cir.1983) (reckless disregard is sufficient to establish intent to defraud); *United States v. Cyr*, 712 F.2d 729, 732 (1st Cir.1983) (same); *United States v. Krepps*, 605 F.2d 101, 104 (3rd Cir.1979) (same); *United States v. Hoffman*, 918 F.2d 44, 46 (6th Cir.1990) (same). And even if there were error in phrasing this inference as mandatory, rather than permissive, it was harmless. As the dissent in *Adamson* pointed out, changing the instruction to allow the jury to infer but not equate intent to defraud with reckless disregard "will probably make no difference in the outcome of any trial ... and is so tenuous as to be more meaningful in the classroom than the courtroom." *Adamson*, 700 F.2d at 969.

■ *Instruction 31*. As with their first objection to Instruction 30, the defendants failed to object to Instruction 31 and therefore the issue will be deemed waived unless it qualifies as plain error. Instruction 31 states:

A bank officer merely by loaning money to a named borrower for the benefit of a third party is not, absent more, a willful misapplication of bank funds. However, such conduct is a willful misapplication of bank funds if the bank officer knows that the money is for the benefit of a third party other than the borrower and that the named borrower will be unable to repay the loan or if the bank officer assures the named borrower he will not have to repay the loan.

While the defendants concede that Instruction 31 is a correct statement of the law, they claim that it is incomplete and misleading because it only discusses the first element of the crime of misapplication of bank funds—that of authorizing nominee loans—without reminding the jury that it must also find intent to defraud. According to the defendants, the distinction between a single element of willful misapplication and the entire crime of misapplication is much too important to be left to such a broad stroke as Instruction 31.

Time and again we have repeated the well-settled doctrine of this circuit that jury instructions are "to be construed in their entirety and not judged in artificial isolation." *Hansen*, 701 F.2d at 1218. Viewed as such, we fail to see anything wrong with Instruction 31. Instruction 29A specifically required the jury to find the existence of all five elements of the offense beyond a reasonable doubt before they could convict the defendants of willful misapplication. Here, the defendants' argument presupposes that the jury forgot about Instruction 29A—an assumption that directly assaults the very foundations of our jury trials. *See United States v. Scop*, 940 F.2d 1004, 1008 (7th Cir.1991) (the ability to follow instruction is the foundation upon which our theory of trial rests). This type of jury error we will not assume.

■ *Instruction 42*. The last instruction to which the defendants direct our attention is Instruction 42. It is commonly referred to an "ostrich" instruction, for it informs the jury that guilty knowledge can be inferred from a combination of suspicion and deliberate ignorance. The defendants claim that this instruction was improperly given since the government never introduced any evidence that the defendants had

a suspicion of any criminal facts and intentionally avoided full knowledge of those facts. As such, they believe they were prejudiced because the jury could have taken the instruction as a license to convict them for negligence without proof of intent. We disagree.

An ostrich instruction is proper when a defendant claims "a lack of guilty knowledge and there are facts and evidence that support an inference of deliberate ignorance," *United States v. Caliendo*, 910 F.2d 429, 433 (7th Cir.1990); those facts and evidence are viewed in the light most favorable to the government under an abuse of discretion standard. *Id.* The evidence certainly supports the ostrich instruction here: Crabtree loaned Cray's wife $97,000 but denied he had any agreement with Cray concerning the use of the proceeds, even though the majority of such proceeds went to Atwater Grain; Crabtree denied knowledge of the $85,000 loans made to two Atwater employees (Giberson and Walker), even though the proceeds went directly to Atwater; and Crabtree knew that the audited financial statement prepared for Atwater did not include the debts owed to Curry Ice. Considering that Crabtree was the first president of Atwater Grain, was actively involved in its management and had a significant financial interest in it, such denials ring hollow and amply justify an inference of deliberate ignorance on his part. We therefore hold that Instruction 42 was properly submitted to the jury.

### C.

 Finally, the defendants attack the district court's decision to admit certain testimony by FBI Agent John Turner. Prior to trial, the court entered its order in conformity with Federal Rule of Evidence 615 that all witnesses be excluded from the courtroom during trial. However, as soon as the defense began putting on their evidence, Agent Turner took a seat at the government's table.

As a law enforcement officer assisting in the prosecution of the case, Agent Turner could have qualified for exemption from exclusion as provided in Rule 615. Apparently the government did not explicitly seek such an exemption. When asked about his role in the trial, Turner responded that he was in attendance as an expert on the check kiting charge against Cray, and that his presence had been cleared with Cray's counsel. Thereafter, Turner attended the testimony of nearly all of Crabtree's witnesses, including Cray's expert, Jay Buck.

Before Turner started his rebuttal testimony, Crabtree's counsel sought side bar confirmation from the government that Turner's testimony would relate only to Cray's check kiting charge. At that time, the prosecution attorneys informed Crabtree and the court that Turner would testify both on the charge of check kiting and on Crabtree's alleged misapplication of bank funds. Crabtree's counsel objected, but his objection was overruled. Turner proceeded with his testimony. The defendants now argue that permitting such testimony was an abuse of discretion that amounted to reversible error. We disagree.

If a witness has violated an exclusion order, it is within the district court's discretion to allow the witness to testify. *United States v. Thomas*, 774 F.2d 807, 810 (7th Cir.1985). There is no abuse of discretion here. The agent could reasonably fit within the exemption provision of Rule 615, which does not authorize exclusion of an officer of the federal government designated as a representative of the government at trial. Moreover, Rule 703 of the Federal Rules of Evidence specifically states that an expert can base his opinion on the facts and data learned from attending the trial and listening to testimony. That is precisely what Agent Turner did; there is little if any difference between counsel disclosing prior testimony to an expert and having an expert listen to such testimony in the courtroom.

The district court did not abuse its discretion by allowing Turner to testify.

### III.

Convictions of Douglas A. Crabtree and Patrick H. Cray are AFFIRMED; the sen-

tences of each defendant are vacated; and the case is REMANDED to the district court for resentencing consistent with this opinion.