**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Lino RODRIGUEZ and Evelio Rodriguez, Defendants–Appellants.**

**Nos. 89–3777 and 90–1329.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 13, 1990.

Decided April 15, 1991.

Mark A. Flessner, Barry R. Elden, Asst. U.S. Attys., Office of the U.S. Atty., Criminal Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Kenneth L. Cunniff, Nathan Diamond–Falk, Chicago, Ill., for defendants-appellants.

Before CUMMINGS, COFFEY, and MANION, Circuit Judges.

MANION, Circuit Judge.

A jury convicted brothers Lino and Evelio Rodriguez of conspiring to distribute cocaine and distributing cocaine. The Rodriguezes appeal, and we affirm.

## I.

In early January 1989, Frank Guerra, an undercover officer for the Illinois State Police, was looking to purchase cocaine. Gene Torres, a confidential informant, introduced Guerra to Christian Martinez, who told Guerra he had a friend who could supply kilograms of cocaine. In the evening of January 18, Guerra, Torres, and Martinez went to the El Capricho Bar on South Blue Island Avenue in Chicago. There, Martinez introduced Guerra to his friend, Evelio Rodriguez, who owned the El Capricho. Guerra told Evelio that he and his brother Fred (another undercover officer) needed five kilograms of cocaine every other week. Evelio assured Guerra that he could supply this amount of cocaine on a day's notice. After discussing price and related matters, Evelio and Guerra agreed to do business. Evelio offered to sell Guerra a one-ounce sample that evening (a sample Guerra told Evelio his other partners would have to see before doing business) but Guerra declined the offer, explaining that he had not brought the money to pay for the sample.

After several attempts to contact Evelio in the following ten days, Guerra reached Evelio at his home on January 30 and arranged to purchase a sample of cocaine at the El Capricho. That afternoon, Guerra, accompanied by his brother Fred, met Evelio and purchased one ounce of cocaine for $700.

On February 1, Frank Guerra called Evelio, and agreed to purchase six kilograms of cocaine. Guerra and Evelio agreed to meet at 7:00 that evening in the parking lot of a Denny's restaurant off of Interstate 55 near Bollingbrook, Illinois, about 25 miles from the El Capricho Lounge. At about 6:00, Lino arrived at the El Capricho in a black Cougar. A burgundy Cadillac, driven by a man named Caesar Ramirez, also arrived at the bar at that time. After speaking briefly outside the bar, Lino in the Cougar and Evelio and Ramirez in the Cadillac drove off to meet the Guerras for the sale.

After exiting Interstate 55, both cars drove to a Shell gasoline station adjacent to the Denny's parking lot. While Ramirez stopped for gas, Lino drove on to the Denny's parking lot. Evelio got out of the Cadillac and into the Cougar. After purchasing gasoline, Ramirez parked the Cadillac in a place from which he could observe the Denny's parking lot.

A short time later, Frank Guerra arrived at the Denny's parking lot in a Corvette. Evelio left the Cougar and walked over to and entered the Corvette. Unbeknownst to Evelio, Guerra was wearing a body transmitter, so everything Evelio and Guerra said was being tape-recorded. Evelio and Guerra discussed the logistics of the deal, and decided to complete the deal at the parking lot of a grocery store located near the Denny's. Guerra and Evelio drove to the grocery store in the Corvette; Lino followed in the Cougar. During the drive, Evelio stated that he had brought six packages of cocaine. Evelio also offered to sell Guerra an ounce of "vidrio," a heroin tar from which brown powdered heroin is made, telling Guerra "there's money in" selling heroin.

After Guerra, Evelio, and Lino arrived at the grocery store parking lot, Evelio left the Corvette, went to the Cougar, and leaned into the Cougar's passenger side. A few moments later Lino exited the Cougar and went to the trunk, followed shortly by Evelio. Lino opened the trunk, removed a white plastic bag, and returned to the Cougar's driver's seat. Evelio returned to the Cougar's passenger side, leaned in, and a few moments later headed back to Guerra's Corvette carrying the white plastic bag, which contained the cocaine.

Evelio handed the cocaine to Guerra and then commented that he was uncomfortable with the location of the deal and that he and Guerra should do things differently in the future. Guerra cut open one of the kilogram packages to check its contents. After doing this, he went over to his brother Fred, who was sitting in a car parked nearby, ostensibly to retrieve the money to pay for the cocaine. When Frank Guerra arrived at Fred's car, they gave a signal to other officers parked at the scene, and these officers arrested Evelio and Lino.

Lino spoke to an Illinois State Police officer shortly after his arrest. Lino told the officer that he did not know anything about the cocaine transaction and was "just helping someone else" and "trying to make some money." Lino also told the officer that being in a bar was very tempting because there are a lot of "things" around and a person could get in trouble. From the context of the testimony about this statement, the jury could infer that "things" meant cocaine or some type of illegal activity.

At trial, Evelio claimed he was entrapped; Lino claimed that he did not know that he was participating in a cocaine transaction. The jury rejected both of these defenses, and found the Rodriguez brothers guilty on all counts charged against them.

## II.

The first—and most substantial—issue on appeal is Lino's contention that the district court erred by giving the jury an "ostrich" instruction. The "ostrich," or deliberate avoidance instruction, taken verbatim from this court's opinion in *United States v. Ramsey*, 785 F.2d 184, 190 (7th Cir.1986), told the jury that it could find Lino had the guilty knowledge necessary to commit the crimes with which he was charged

> from a combination of suspicion and indifference to the truth. If you find that [Lino] had a strong suspicion that things were not what they seemed, or that someone has withheld some important facts, yet shut his eyes for fear of what

he would learn, you may conclude that he acted knowingly....

■ The ostrich instruction's purpose is to inform the jury that a person may not escape criminal liability by pleading ignorance if he knows or strongly suspects he is involved in criminal dealings but deliberately avoids learning more exact information about the nature or extent of those dealings. " '[T]o know, and to not want to know because one suspects, may be, if not the same state of mind, the same degree of fault.' " *United States v. Giovannetti*, 919 F.2d 1223, 1228 (7th Cir.1990) (quoting *AMPAT/Midwest, Inc. v. Illinois Tool Works, Inc.*, 896 F.2d 1035, 1042 (7th Cir. 1990)). From this purpose, it follows that evidence that a person suspects wrongdoing, by itself, is not sufficient to justify giving an ostrich instruction; the instruction is not meant to allow a jury to convict a person for negligence. *Id.* at 1227–28. Instead, as we pointedly emphasized in *Giovannetti*, the ostrich instruction is proper only when there is evidence that a person suspects he is involved in wrongdoing *and* that he took deliberate steps to avoid acquiring knowledge. *Id.;* see also *United States v. Caliendo*, 910 F.2d 429, 433 (7th Cir.1990).

■ Lino argues that the evidence supported one of two conclusions: either he knew what was going on, or he did not know. According to Lino, there was no evidence that he suspected what was going on but deliberately avoided finding out. Viewing the evidence in the light most favorable to the government, as we must, see *United States v. Caliendo*, 910 F.2d 429 at 433–34, we disagree. Lino told an Illinois State Police officer that he did not know he was transporting cocaine, but that he was trying "to make some money" and that being in a bar was "very tempting" because "it's a lot of things [which the jury could have taken to mean drugs] around and one could get in trouble." From this (and from the circumstances of the trip to Bollingbrook itself), the jury could conclude that Lino must have at least suspected that the purpose of his trip was to help deliver cocaine. Despite the suspicious circum-

stances of the trip, and despite the fact that Lino knew that a person could "get in trouble" because of the drugs in the bar, and despite the fact that Lino spent time with the major participants in the deal before actually driving to the delivery point, Lino did not bother to ask any of the participants exactly what was going on (a fact the jury could infer from Lino's claim of ignorance). It would not have been unreasonable for the jury to conclude from all this that his failure to ask for more details was an attempt to avoid learning exactly what he was participating in—"a cutting off of one's normal curiosity by an effort of will." *Giovannetti*, 919 F.2d at 1229; see also *United States v. Josefik*, 753 F.2d 585, 589 (7th Cir.1985). This was sufficient to justify giving the ostrich instruction. See *Giovannetti*, 919 F.2d at 1229.

 Lino also argues in passing that it was inappropriate to give an ostrich instruction in this case, in which he was charged with conspiracy, because conscious avoidance is generally insufficient to prove knowledge in conspiracy cases. Lino cites *United States v. Kehm*, 799 F.2d 354, 362 (7th Cir.1986), for this proposition, a rather curious citation in that *Kehm* held "that in a conspiracy prosecution it is permissible to give an ostrich instruction as part of the definition of knowledge or knowingly." It is true that if a person consciously avoids joining in a conspiracy, he is innocent; whether a person knows that an activity is illegal is irrelevant if a person avoids participating in that activity. But Lino in this case, as the defendant in *Kehm*, agreed to do something with the other conspirators (transport something) without fully knowing the extent of his agreement (that what he was transporting was cocaine). See *id.* In such a case, it is appropriate to instruct the jury that consciously avoiding finding out the full scope of the agreement constitutes legal knowledge. *Id.* Lino was not consciously avoiding acting with the other conspirators; he was consciously avoiding

finding out exactly what the conspiracy entailed.

 Evelio and Lino raise several other arguments, none of which have any merit. Evelio argues that the district court erred by not granting a mistrial when Frank Guerra inadvertently blurted out that Evelio had previously been arrested for participating in a heroin transaction. Actually, Evelio's attorney's objection cut off Guerra's answer before he could actually say the arrest had been for a heroin transaction; however, the context within which Guerra mentioned the previous arrest makes it clear he was referring to heroin, so we shall assume he actually did. In either event, the district court did not abuse its discretion by denying a mistrial. The district court sustained Evelio's objection to Guerra's testimony, struck the testimony, and instructed the jury to disregard any mention of Evelio's arrest. Generally, we assume the jury followed the court's instruction and that the court's curative measures were sufficient to prevent any harm. See *United States v. Fulk*, 816 F.2d 1202, 1205 (7th Cir.1987).

 Evelio, however, insists that the judge's prompt curative measures were inadequate to prevent prejudice to his case because the reference to his heroin arrest destroyed his entrapment defense by strongly tending to show his predisposition to deal drugs. This assertion is fanciful. In a tape-recorded conversation, the jury heard Evelio offer to sell heroin to Guerra and tell Guerra there was money to be made dealing heroin. The jury also heard Evelio talk about future deals with Guerra, a rather strange topic of conversation for a person supposedly induced to do something he did not want, and was not predisposed, to do. Given Evelio's taped remarks, it is almost inconceivable that Guerra's inadvertent reference to Evelio's prior arrest made any difference in the jury's decision to reject Evelio's entrapment defense.[1]

---

1. The government notes that the district court failed to instruct the jury that the government bore the burden of proving beyond a reasonable doubt that Evelio was not entrapped. See *United States v. Johnson*, 605 F.2d 1025, 1028–29

(7th Cir.1979) (en banc), which states that the district court should specifically instruct the jury on the government's burden of disproving entrapment. However, since Evelio does not raise this issue on appeal, he has waived it.

Evelio also argues that the district court clearly erred by increasing his offense level by two levels for lying at trial. Guideline § 3C1.1 mandates a two-level increase for obstructing justice; Application Note 3(b) to § 3C1.1 lists perjury as an example of the conduct § 3C1.1 applies to. Evelio argues that the statements on which the district court based its conclusion that he committed perjury are nothing more than minor inconsistencies with other testimony and reflect nothing more than a less-than-perfect recollection of events rather than a conscious effort to mislead the jury. Evelio's alleged misstatements at trial, however (for example, his testimony that he did not tell Guerra he could regularly supply large quantities of cocaine, that he did not tell Guerra he knew the price of cocaine, that he never offered to sell Guerra heroin, and that Lino never went with him to the Cougar's trunk to retrieve the cocaine), all served one of two purposes: to bolster Evelio's entrapment defense, or to exonerate Lino. Given this pattern, it was not clear error for the district court to conclude that Evelio's misstatements were outright lies intended to mislead the jury, rather than lapses in memory, and thus were an attempt to obstruct justice.

Finally, Evelio and Lino contend the following instruction was error:

In determining whether a defendant became a member of the conspiracy, you may consider the acts and statements of that particular defendant. You may also consider the acts and statements of the other alleged conspirators made during the course of the conspiracy as bearing on the question of a defendant's membership in the alleged conspiracy.

To be a member of the conspiracy the defendant need not join at the beginning or know all of the other members or the means by which the purpose was accomplished. The government must prove beyond a reasonable doubt that from the defendant's own acts and statements that he was aware of the common purpose and was a willing participant.

Evelio and Lino contend it was error to instruct the jury it could consider co-conspirators' acts and statements in determining whether a defendant joined the conspiracy. In *United States v. Martinez de Ortiz*, 907 F.2d 629 (7th Cir.1990) (en banc), we rejected the same challenge to a similar jury instruction, holding that co-conspirator statements could be relevant in showing that a defendant joined a conspiracy. Under *Martinez de Ortiz*, the district court's conspiracy instruction was not erroneous.

For the reasons set out above, we affirm Lino's and Evelio's convictions.

AFFIRMED.

---

Even if he had raised this issue on appeal, we would not reverse. Evelio did not object to the court's entrapment instruction at trial; therefore, any error is reversible only if it was plain error, which means that reversal is necessary to prevent a miscarriage of justice. See *United States v. Sherwood,* 770 F.2d 650, 652–53 (7th Cir.1985). Given the strong evidence of Evelio's predisposition to deal drugs (much of which came from Evelio's own mouth when talking with Guerra on tape), the court's failure to instruct on the government's burden was not plain error.