UNITED STATES of America,
Plaintiff–Appellee,

v.

Bertha CRAIG, Defendant–Appellant.

No. 98–2252.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 22, 1999.

Decided May 20, 1999.

Stephen Heinze (argued), Office of the United States Attorney, Criminal Division, Chicago, IL, for Plaintiff–Appellee.

J. Reed Millsaps (argued), Northbrook, IL, for Defendant–Appellant.

Before EASTERBROOK, KANNE, and DIANE P. WOOD, Circuit Judges.

KANNE, Circuit Judge.

After the Department of Education's investigation of several beauty academies owned by Paul and Diane Scardino turned up evidence that the schools had defrauded the federal government of thousands of dollars through a scam involving the distribution of Pell Grant funds, the government charged Bertha Craig and fourteen others in a fifty-four count indictment. While the others pleaded guilty, Bertha Craig maintained her innocence. Following a trial, she was found guilty of two counts of wire fraud and one count of misappropriation of Pell Grant funds. The district court sentenced her to eighteen months imprisonment and three years of supervised release. Craig challenges the district court's decision to provide an "ostrich" instruction to the jury, as well as the calculation of her sentence under the United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines").

### I. History

Craig worked at the Riviera Beauty Academy ("Riviera") in Chicago, Illinois, until she was laid off in the summer of 1992. The Scardinos owned Riviera, as

well as a number of other beauty academies, and worked at Riviera an average of three to four days each week. During her tenure at Riviera, Craig donned many hats. She was one of three instructors, teaching "juniors" and "seniors" a course in theory as well as overseeing the school's clinical course. She also helped to recruit students. While she did not have the title of "manager," many of her duties related to the administrative responsibilities associated with such a position. She certified transcripts, attended managers' meetings, and was in charge when the Scardinos were not available. She also attended each orientation session during which she handed out a beauty kit containing supplies to the new students and talked about the courses.

During this time, Riviera participated in the federal Pell Grant program. This program provides money to low-income students for short-term educational training. The schools that participate in the program receive the funds based on the number of eligible students. The schools administer the program and determine which students are eligible to receive funds. They act as fiduciaries and hold the money for the student beneficiaries. The federal government has established a set of baseline requirements that schools must follow in determining student eligibility. Under these requirements, students are eligible for Pell Grant funds only if they are (1) enrolled at least half-time for the purpose of receiving a degree and (2) have a high school diploma or a G.E.D. or pass an "ability to benefit" test. Once the school concludes that a student is eligible, it must maintain documentation of that student's eligibility for at least five years. After the determination has been made, the Pell Grant program will distribute funds to the participant school up to three weeks before the student begins the program to cover start-up costs. If the student does not in the end attend the school, the Pell Grant money must be returned. Attendance at orientation alone is not enough to allow the school to retain all of the funds.

Like many educational institutions, Riviera had the Pell Grant funds electronically transferred to the school through the Electronic Student Aid Report ("ESAR"). Under this system, Riviera electronically transferred the required financial information of eligible students to National Computer Systems ("NCS"). NCS used the information to confirm that the student was indeed eligible for a Pell Grant. NCS then returned a copy of the ESAR to Riviera, which, in turn, had the student sign it. Once the student signed the form, Riviera could collect the funds.

In 1992, Riviera came under increased scrutiny from two angles. First, the company Riviera had hired to administer the Pell Grant funds discovered when it reviewed Riviera's ESARs that several of the signatures on the forms were similar. The company contacted Riviera and told the school it would not process the forms until the problem had been "straightened out." Around the same time, the U.S. Department of Education ("Department") began investigating all of the beauty academies owned by the Scardinos because many of these schools had a default rate of sixty percent or greater with regard to their loans. During this investigation, the Department reviewed student files. As a result of its investigation, the Department declared Riviera ineligible to participate in the Pell Grant program.

The Department's investigators concluded that Riviera had defrauded the federal government by improperly obtaining Pell Grant funds purportedly for the use of low-income students. These investigators described the scam at Riviera as including the falsification of documents, the recruitment of unqualified students who were used to establish fake files, and, ultimately, the operation of a school that hardly graduated anyone. When it reviewed Riviera's records, the Department determined that in the 1990–91 academic year, of the 841 students for whom Riviera received Pell Grant funds, no files existed for 642 of

them. During that year, Riviera derived ninety-three percent of its total revenues from Pell Grant funds. In the 1991–92 academic year, 1284 students received Pell Grant funds. Of these, there were no records for 171. A vast majority, 992, attended Riviera for eight hours or less. Craig certified transcripts for 1085 of these students. Riviera, in that year, derived ninety-one percent of its total revenues from Pell Grant funds. During this time, only one percent of the students who received Pell Grants finished Riviera's cosmetology program. Of those, only *four* passed the state examination and became licensed to practice in the State of Illinois.

The scam involved several employees of Riviera. It began with the school's "recruiters," who worked on commission. By the time the investigation had concluded, these individuals received $200 for each student they brought to the school. Several recruiters testified during Craig's trial, relaying similar stories. According to these individuals, Paul Scardino instigated a push to find as many students as possible to fill the classrooms. Initially in 1991, Riviera began a new session each month; Scardino changed this schedule to a biweekly rotation. The recruiters testified that he openly told them to recruit individuals on Medicaid or Public Aid and to avoid students who worked, because the latter group would not qualify for Pell Grant funds. He held up as role models recruiters who brought in more than twenty students each month, even though not one remained at the school. Basically, the recruiters were finding anyone they could round up to fill the chairs at orientation and provide an identification number so paperwork could be submitted to the Pell Grant program. If the person did not have at least a social security number, Paul Scardino gave recruiters money to purchase identification cards for them. Many of those who had been recruited to attend the orientation sessions appeared uninterested in the school's programs and were loud and abusive. Often these individuals remained only long enough to re-

ceive the beauty kits from which the more expensive items had been removed. In addition, some were funneled through the orientation session several times. No instructions were provided to these "students" during the orientation sessions. While each session lasted only two to three hours, Riviera recorded them as lasting eight hours, so that the school could obtain Pell Grant funds for them.

Craig admitted to recruiting students. Her tax forms confirm she received payment for the students she recruited. At least twenty-seven of the students she brought to Riviera attended the school for eight hours or less. Only nine had G.E.D.s.

Once Riviera had names and identification numbers, it began the process of falsifying documents for the files required by the Pell Grant program. Recruiters admitted to preparing fake G.E.D. certificates, high school diplomas, and transcripts. At least three Riviera employees who worked with financial aid brought fake documents to Craig's·attention. She, in turn, took these employees to Paul Scardino with the falsified documents. It is unclear whether Scardino told Craig to continue the practice, but it is clear that he told the other employees to accept the documents and that the practice continued.

Several of these employees testified that they had seen Craig actively participate in this scam by falsifying an ESAR, filling out enrollment contracts and other paperwork, and participating in a "recycling" of student files. Others testified that she had instructed them to falsify documents as well. Two recruiters stated that they split their commission fees for recruiting students with her after she had told them to find students so that they could reuse already existing files.

Craig disputed this testimony at trial. She did admit to signing student transcripts attesting that the students had attended Riviera for the recorded number of hours without personal knowledge of their

actual attendance. She claimed she did not think of looking at the students' files when engaging in this process. She said she signed the transcripts of students she knew did not attend full-day orientation sessions only because Diane Scardino told her to do so. In addition, she admitted to attending an orientation session at which there were fifty to sixty students, most of whom did not return after that first day. She also signed the enrollment contracts as completed by the financial aid employees. Craig admitted that she noticed some inconsistencies and problems at Riviera, but claimed that she either did not think about them or acted properly by bringing them to the Scardinos' attention. Although these suspicious practices continued, she did not inquire further or take any other action.

Between 1990 and 1992, Craig's income from Riviera rose. Her tax records indicate that in 1990 she received $21,700 in wages and $8,800 in commissions. In 1991, she received $24,500 in wages and $26,500 in commissions. In 1992, she was laid off in June, but still received $12,500 in wages and $6,600 in commissions. While she disputes the amount of commissions she received, she presented no evidence at trial outside of her own testimony to support her position.

Craig was tried before a jury, and the district court, over Craig's objections, gave an "ostrich" instruction, which informed the jury that it could find Craig guilty even if it concluded she did not actually know about the scam, if it determined that she lacked this knowledge because she deliberately remained ignorant of the scam. The jury found her guilty. Prior to her sentencing, Craig filed a written objection to the presentence investigation report. The district court concluded with respect to her sentence that Craig should not receive a three-level enhancement for a supervisory role nor the full eleven-level increase for the amount of loss. The court did, however, agree with the presentence investigation report's conclusions that she

should receive a two-level enhancement for obstruction of justice and not receive an adjustment for acceptance of responsibility. The court sentenced her to eighteen months imprisonment and three years of supervised release under U.S.S.G. § 2F1.1 for fraud. The district court calculated a base offense level of six, which it increased by five levels for the specific offense characteristic of loss to the government. It also assessed a two-point enhancement for obstruction of justice under U.S.S.G. § 3C1.1 because the court found her to have been less than truthful when she testified. Craig appeals her conviction and her sentence.

## II. Analysis

Craig's appeal centers on two different aspects of her trial and sentencing. First, she contends that the district court erred in giving the jury an "ostrich" instruction. Second, she claims the district court erred when it increased her base offense level by five levels because the government suffered loss due to her conduct and when it added a two-level enhancement after concluding she had obstructed justice. We, however, agree that the district court's decision to provide an "ostrich" instruction in this case was appropriate and find no reason to disturb its calculation of her sentence under the Sentencing Guidelines.

### A. Application of the "Ostrich" Instruction

 Craig asserts the district court erred by giving an "ostrich," or "conscious avoidance," instruction over her objections. The district court instructed the jury that:

When the word "knowingly" is used in these instructions, it means the defendant realized what she was doing and was aware of the nature of her conduct, and did not act through ignorance, mistake or accident. Knowledge may be proved by the defendant's conduct, and by all of the facts and circumstances surrounding the case. You may infer knowledge from a combination of suspi-

cion and indifference to the truth. *If you find that a person had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet shut her eyes for fear of what she would learn, you may conclude that she acted knowingly, as I have used that word.*

(emphasis added). Craig does not object to the language used by the court, which is similar to formulations of the instruction we have consistently endorsed, *see United States v. Neville,* 82 F.3d 750, 759–60 (7th Cir.1996); *United States v. Ramsey,* 785 F.2d 184, 190–91 (7th Cir.1986), and tracks Federal Criminal Jury Instructions of the Seventh Circuit § 4.06. Rather, she claims that the government presented no evidence that she purposefully avoided learning about the Riviera scam. We review a district court's decision to give an ostrich instruction for abuse of discretion, viewing the evidence in the light most favorable to the government. *See United States v. Caliendo,* 910 F.2d 429, 433–34 (7th Cir.1990).

■ Courts provide juries with the ostrich instruction to explain that the law expands the definition of "knowledge" for purposes of determining whether a defendant committed a specific act. *See id.* at 433. It equates actual knowledge with the deliberate avoidance of knowledge. *See Ramsey,* 785 F.2d at 189. The purpose of the instruction "is to inform the jury that a person may not escape criminal liability by pleading ignorance if he knows or strongly suspects he is involved in criminal dealings but deliberately avoids learning more exact information about the nature or extent of those dealings." *United States v. Rodriguez,* 929 F.2d 1224, 1227 (7th Cir.1991). The instruction is appropriate "only when it addresses an issue reasonably raised by the evidence." *United States v. Diaz,* 864 F.2d 544, 549 (7th Cir.1988). Thus, if "the actions of the alleged co-conspirator and the surrounding circumstances indicate that the only way the defendant could not have known of the illegal activity is by affirmatively avoiding the knowledge," *United States v. Fauls,* 65 F.3d 592, 598–99 (7th Cir.1995), the instruction is appropriate. We have held that the instruction is proper when "the defendant claims a lack of guilty knowledge and there are facts and evidence that support an inference of deliberate ignorance." *Diaz,* 864 F.2d at 550 (quoting *United States v. White,* 794 F.2d 367, 371 (8th Cir.1996) (quoting *United States v. McAllister,* 747 F.2d 1273, 1275 (9th Cir.1984))).

■ Craig clearly claims a lack of guilty knowledge, and, thus, we focus on the second aspect of this legal standard. Evidence of deliberate ignorance of knowledge may be established by overt, physical acts as well as by "purely psychological avoidance, a cutting off of one's normal curiosity by an effort of will . . . ." *United States v. Stone,* 987 F.2d 469, 472 (7th Cir.1993). Craig points to *United States v. Giovannetti,* 919 F.2d 1223 (7th Cir.1990), to support her contention that the government did not put forth evidence of either affirmative acts or a mental state constituting avoidance. In *Giovannetti,* we concluded that the district court improperly gave the jury an ostrich instruction because no evidence in the record indicated the defendant had overtly or psychologically avoided learning that a house he rented to others had been used as a wireroom for gambling. *See id.* at 1228. The government presented a tape-recorded conversation establishing that the defendant learned his property was used as a wireroom, but the tape did not establish the time at which he learned of this illegal use. *See id.* at 1227. Even though he drove near the rented property daily, he would have had to alter his normal commuting route to pass the house and be exposed to the illegal activities occurring there. *See id.* at 1228. Because it was entirely possible that he learned of the wireroom's existence only after the illegal use had ended, we concluded that the tape was not evidence that he had hidden his head in the sand to avoid learning of the property's use while the

wireroom was actually in existence. *See id.* at 1227.

Craig asserts that she, like the defendant in *Giovannetti*, would have to have "alter[ed her] commuting route" to avoid learning about the scam. She stresses that she did not know how Riviera processed financial aid applications. Her job was only to fill out and sign student transcripts. She claims she questioned Diane Scardino about the fact that the students for whom the transcripts were being created did not attend the listed number of hours or courses. Scardino told her to fill them out anyway, and she did. She also disputes the notion that she "buried her head in the sand." When other employees of Riviera brought troubling issues to her attention, such as suspicious G.E.D. certificates and students who reappeared at different orientation sessions, she contends that she confronted the problems directly by taking the other employees with the questionable documents to Paul Scardino. Thus, she claims that she had no actual knowledge of the scam and would have had to have gone out of her way to learn about it.

Her actions, however, are not like those of the defendant in *Giovannetti*. We concluded that the defendant in *Giovannetti* had "failed to display curiosity," but did not avoid the truth being communicated to him. Craig's purported ignorance comes from more than a simple lack of curiosity. It is undisputed that Riviera employees brought questionable documents to Craig, which, in turn, raised questions in her mind. When she took these employees and documents to Scardino, he told the employee to accept them. It is unclear if she was present during his subsequent discussions with these individuals and heard his instructions to continue accepting the questionable documents. If Craig did learn of the results of these conversations, she failed to question Scardino's less than legitimate position. If she did not know that he instructed the employees to accept the falsified documents, her failure to follow up with him and question the soundness of the policy when other suspicious documents turned up demonstrates a cutting off of her normal curiosity as well. Craig also signed transcripts without checking their accuracy. This practice hardly seems responsible or a normal practice for a person in Craig's position. She admitted that she knew that many of the students' transcripts she signed did not correctly indicate the number of hours they had actually attended the school. She claims she simply followed orders from Diane Scardino and did as she was told. Her failure to ask further about these policies, unlike the defendant's failure to alter his driving path in *Giovannetti*, supports an inference of deliberate ignorance, making it reasonable for a jury to conclude that she avoided learning the truth.

Her failure to inquire into Riviera's practices is more like that of the defendant in *Rodriguez*, 929 F.2d at 1228, in which we approved of the use of an ostrich instruction, than like that of the defendant in *Giovannetti*. In *Rodriguez*, we concluded that sufficient evidence demonstrated that a defendant had deliberately avoided learning the truth when he did not ask any of the participants in a drug distribution scheme exactly why they needed him to make a trip. *See id.* at 1227–28. He claimed he was "just helping someone else" and "trying to make some money." *Id.* at 1227. Based on this evidence, we concluded an ostrich instruction was appropriate because a jury could reasonably conclude that he had deliberately avoided the truth. *See id.* at 1228. The principle illustrated by *Rodriguez*—that it would be reasonable for a jury to conclude that a defendant's failure to ask for more details was an attempt to avoid learning the truth—is also relevant to Craig. Her failure to ask questions that would certainly arise from the circumstances, like that of the defendant in *Rodriguez*, is evidence that could lead a jury to determine she

deliberately avoided learning about the Riviera scam.

The result we reached in *Caliendo*, 910 F.2d at 434, also buttresses our conclusion. In that case, one of the defendants claimed that she did not know about an illicit business, even though she managed an adult bookstore closely affiliated with the illicit business and handled the records and receipts of that illicit business. *See id.* Craig is in a similar position in that she served as a de facto manager of Riviera and also handled the transcripts of Riviera. Just as we found that the district court in *Caliendo* appropriately gave an ostrich instruction to that jury with regard to that defendant, *see id.*, we find the district court appropriately offered it to the jury in the present case.

Other evidence presented at trial also supports an inference of deliberate ignorance. As a recruiter, Craig admitted to receiving commissions for students she enrolled at Riviera. Other recruiters testified that she asked them to seek out students to serve as bodies for the files that the school already had. She also participated in the orientation session at which these fake students appeared. It seems unlikely she would have been so gullible or naive as to believe individuals who were pulled off the street, many of whom were drug addicts and disruptive during the sessions, were serious students. As the district court aptly noted: "You know, to just drag in the winos and the junkies off the street and run them through this process as if they were sand through a sieve and then to say: I didn't know anything about what was going on here and, I mean, it seemed okay to me or whatever, is absolutely incredible." In addition, many of those at the orientation sessions never attended classes and left after receiving their "beauty kits." It seems unlikely that it escaped her notice that during this time only a tiny fraction of those individuals who enrolled in the school actually completed the program and of those who did only four became licensed by the State of Illinois. It would be reasonable for a jury to conclude that by engaging in these behaviors, she was psychologically avoiding the discovery of the truth. Unlike the defendant in *Giovannetti* against whom the prosecution did not present evidence of circumstances from which a jury could conclude he acted in deliberate ignorance, Craig faced circumstantial evidence presented by the prosecution at trial that created the possibility that Craig, while engaged in her day-to-day activities at Riviera, certainly saw and experienced enough suspicious activities to raise several red flags. The evidence, therefore, supports an inference that she consciously chose not to pursue the truth.

In *Giovannetti*, we concluded that an ostrich instruction was inappropriate because the evidence presented by the prosecutors created only a "binary choice" for the jury. *See* 919 F.2d at 1228. The facts required that jury to determine whether the defendant had "actual knowledge" of the use of the house or was "complete[ly] innocen[t]." *See id.* They did not require the jury to determine if he had hidden his head in the sand. *See id.* In such cases, an ostrich instruction should not be given because it will most likely confuse the jury and create the potential for a guilty verdict based not on the defendant's actual knowledge or the defendant's deliberate avoidance, but rather upon what the jury concludes he should have known. *See id.* Craig's case is different. Her jury did not have to choose between knowledge and innocence. Instead, the district court properly gave the ostrich instruction because the evidence demonstrates a set of circumstances in which the possibility of deliberate avoidance of the truth by Craig exists. Thus, the comparisons Craig draws between her situation and that of the defendant in *Giovannetti* are simply not persuasive.

As in the myriad of cases in which we have approved of the use of an ostrich instruction, *see, e.g.*, *United States v. Wilson*, 134 F.3d 855, 868–69 (7th Cir.), *cert.*

*denied,* —— U.S. ——, 119 S.Ct. 216, 142 L.Ed.2d 178 (1998); *Neville,* 82 F.3d at 759–60, the evidence in this case supports the use of the ostrich instruction by creating an inference of deliberate ignorance. We believe the district court properly gave the ostrich instruction.

## B. Sentencing

Craig also challenges two aspects of the district court's calculation of her sentence under the Sentencing Guidelines. Specifically, she contests the district court's five level increase for loss sustained by the government and the two level increase for obstruction of justice. The government did not appeal the district court's sentence determinations.

 First, Craig asserts that the district court erroneously increased her offense level five levels based on its calculation of the amount she gained from the scam. We review the district court's factual finding as to the amount of loss for clear error.[1] *See United States v. Jackson,* 95 F.3d 500, 505 (7th Cir.1996). The district court sentenced Craig in accordance with U.S.S.G. § 2F1.1, governing sentences for offenses involving fraud. The court calculated her base level as six. The presentence investigation report suggested an increase of eleven levels because the total loss to the government exceeded $800,000. While the district court acknowledged that the loss was "somewhere in the area of 1.3 or one and a half million dollars," it also stated that the Scardinos

received the "vast majority of these sums" and expressed reluctance of "laying this entire load on Bertha [Craig]." Instead of adopting the presentence investigation report, it chose to calculate the increase based on the amount she gained, which she would not have received "if this massive scheme wasn't being perpetrated." The court concluded that she had gained more than $40,000, which left her with an increase of five levels.

Craig contests these findings, arguing that the district court computed her commissions incorrectly, impermissibly included her legitimate salary into the calculation, and incorrectly based these figures on her earnings from 1990–92. Craig supports her claims regarding the calculation of her commissions by pointing out discrepancies in the testimony of different witnesses. She contends that the testimony of one witness demonstrates that she recruited only seventy-nine students and that only twenty-seven of these were listed as attending the school for eight hours or less. Another witness testified that Craig would have received a commission of only $75 per student. The testimony of these two witnesses, she claims, demonstrates that she gained only between $2,025 and $5,925. Other evidence in the record, however, supports the district court's conclusion. Namely, Craig's 1099 tax forms state that for the years 1990–92, she earned $41,900 in commissions. While she denied recruiting fictitious students, Craig also testified that the amount recruiters received for each student increased during

---

1. In reaching its conclusion, the district court defined "loss" for the purposes of U.S.S.G. § 2F1.1 using the amount of money Craig gained from her participation in the scam. While the Sentencing Guidelines permit courts to look to a defendant's gain as a basis for calculating loss, courts should do so when the exact amount of the loss to the victim is unknown. *See United States v. Andersen,* 45 F.3d 217, 221 (7th Cir.1995); *see also* U.S.S.G. § 2F1.1 cmt. 7 ("[L]oss is the value of money, property, or services unlawfully taken."). The parties in this case, however, did not dispute the amount of loss—roughly $1.2 million—to the government. As the dis-

trict court acknowledged at Craig's sentencing hearing, the entire amount of the loss is attributable to all individuals who participated in the scheme. The prosecution, however, chose not to challenge this aspect of the district court's sentence. While we would normally review this type of determination *de novo, see United States v. Jackson,* 95 F.3d 500, 505 (7th Cir.1996), the challenge before us deals only with the district court's factual finding as to the amount of the loss, not its definition of the term "loss." Therefore, our review of this decision is limited to one for clear error. *See id.*

these years. At first they received $50 per student, then $100, and finally $200. The district court indicated that it found the testimony of other witnesses who said she had recruited fictitious students and the 1099 tax forms more credible than the evidence to the contrary. District courts are in the best position to weigh the evidence presented to them, and we are reluctant to second-guess their conclusions. Thus, we find the district court was not clearly erroneous in reaching its conclusion about the amount Craig received for recruiting fictitious students to Riviera.

We are also unpersuaded by Craig's challenges to the district court's inclusion of her salary in the calculation. The district court noted that inclusion of her salary in the calculation would be appropriate because, the court reasoned, if not for the scheme, she would not have been employed so as to receive a salary. Basic arithmetic, however, demonstrates that the court did not ultimately include the salary amount in its calculation of the increase of her base offense level. According to her 1099 tax forms, Craig received $58,700 in salary from 1990–92. Adding this amount to the $41,900 she received in commissions means that she earned $100,600 for those years. If the district court had used this calculation, it would have increased her base offense level by *six* levels rather than *five*. *Compare* U.S.S.G. § 2F1.1(b)(1)(G) (requiring an increase of the base offense level of six points if the loss was more than $70,000) *with* U.S.S.G. § 2F1.1(b)(1)(F) (requiring an increase of the base offense level of five points if the loss was more than $40,000). Thus, we find no reason to conclude the district court's calculation as to this point was erroneous.

Craig's final point about the increase to her base offense level due to the loss involved also falls flat. She contends that because one witness testified that she discovered falsified documents in August 1991, the court should have concluded that the scheme did not begin until that time. Such a conclusion strains credulity. That

same witness testified that she noticed nonlegitimate admissions as early as 1990. Other witnesses also testified that aspects of the scam occurred in 1990 as well, such as crediting students for time they were not actually attending orientation. Another witness testified that he saw falsified documents as early as January 1991. We find no reason to disturb the district court's conclusion from the evidence before it that the scheme began before August 1991.

■ Craig's second challenge to her sentence involves the district court's increase of her offense level by two levels because it concluded she was less than honest when testifying about her role as a recruiter for Riviera. In reaching its conclusion, the district court relied upon the testimony of two other witnesses and Craig's 1099 tax forms. It found these sources more credible than Craig's denial. Craig claims that in reaching this conclusion the district court did not make the required specific findings of perjury. We disagree.

■ Because enhancements under U.S.S.G. § 3C1.1 involve the factual finding that the defendant willfully obstructed or attempted to obstruct justice, we defer to the district court's conclusions and reverse them only for clear error. *See United States v. Agostino,* 132 F.3d 1183, 1198 (7th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1526, 140 L.Ed.2d 677 (1998). We will overturn the district court's factual findings relating to sentencing "only if our review of the record leaves us with a definite and firm conviction that a mistake has been committed." *United States v. Hickok,* 77 F.3d 992, 1007 (7th Cir.1996) (internal quotation marks and citations omitted). In adjusting Craig's base offense level, the district court turned to, among others, U.S.S.G. § 3C1.1, which deals with "Obstructing or Impeding the Administration of Justice." This Sentencing Guideline advises courts to increase the offense level by two levels "[i]f the defendant willfully obstructed or impeded, or attempted to

obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense...." U.S.S.G. § 3C1.1. To apply this enhancement, a district court must make separate findings that "establish a willful impediment to or obstruction of justice, or an attempt to do the same...." *United States v. Dunnigan*, 507 U.S. 87, 95, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993). A defendant who merely denies her guilt has not earned the two-level increase. *See Hickok*, 77 F.3d at 1007.

Courts often apply this enhancement for perjury. *See id.* at 1006; U.S.S.G. § 3C1.1 cmt. 3(b). When instructing courts about this enhancement, the Supreme Court points them toward the federal criminal perjury statute and defines perjury as occurring when a witness, who testifies under oath or affirmation, gives false testimony about a material matter with the willful intent to do so, rather than as a result of mistake, faulty memory, or confusion. See *Dunnigan*, 507 U.S. at 94, 113 S.Ct. 1111 (citing 18 U.S.C. § 1621(1)). In a perfect world, the district court would always make a separate and clear finding for each element of the alleged perjury, but the Supreme Court has realized that the ideal is not always possible. *See id.* at 95, 113 S.Ct. 1111. Thus, it has instructed that as long as the district court "makes a finding of an obstruction of, or impediment to, justice that encompasses all of the factual predicates for a finding of perjury," an appellate court can uphold the enhancement. *See id.*

We find no merit to Craig's contentions that the district court did not make specific findings in regard to two of the factual predicates necessary for a finding of perjury. First, she claims the district court did not specify the testimony that it considered perjurious. Second, she claims the issue of recruiting students was not material to the government's case against her. When it applied the obstruction of justice

enhancement to Craig, the district court stated:

> [S]he has no right to take the stand and be less than truthful. And I believe that's the circumstances as far as Bertha Craig is concerned, at least in one area. It has to do with whether or not she personally was involved in the recruiting of any of these fictitious students. She says no. There are two things that lead me to believe that the facts are otherwise. Number one, two other people who testified here also under oath denied those allegations and said that she did recruit and, [second], I suppose the best evidence to me is that she received her 1099s which show some income from the recruitment of those students. And, therefore, it is my judgment that she has been less than truthful in that regard and that the 2–point enhancement for obstruction of justice does apply.

It is clear from this statement that the district court has highlighted the testimony it found false—her denial of being a recruiter of fictitious students. During her direct testimony, Craig denied recruiting individuals who were not qualified or interested in the school. Her testimony was not a denial of guilt, but rather of a specific activity. The district court points to the testimony of other witnesses who contradicted her testimony and the documentary evidence of her 1099 tax form. It is within the district court's purview to judge issues of credibility. We will not set its findings aside lightly. These facts, clearly outlined and clearly in the trial record, provide ample support for the district court's factual findings on this point.

Craig's complaint that the factual issue of whether she recruited fictitious students is not material to the government's case against her is nonsensical. We have stated that matters are material if they are "crucial to the question of ... guilt...." *See United States v. Senn*, 129 F.3d 886, 898 (7th Cir.1997) (quoting *United States v. Mustread*, 42 F.3d 1097, 1106 (7th Cir. 1994)). In other contexts, the Supreme

Court has defined materiality as "hav[ing] a natural tendency to influence, or [being] capable of influencing, the decision of the decisionmaking body to which it was addressed." *United States v. Wells*, 519 U.S. 482, 483, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997). The question of whether Craig recruited fictitious students clearly goes to the question of her guilt and would influence a jury as to its decision about her guilt. The recruiters were an intricate part of the Scardinos' scam. Without them, the fictitious students would not have flowed through the doors of Riviera. Recruiters, like Craig, reaped financial benefits from their activities. Although enough evidence exists in the record to make it reasonable to conclude that a jury could have found Craig guilty of the charges without her having been a recruiter, the fact that other evidence supports the ultimate conclusion does not make this piece of evidence, upon which a finding of guilt could also be maintained, immaterial. Thus, the fact that Craig recruited fictitious students is material.

Therefore, the district court did not err by enhancing Craig's base offense level by a total of seven points. It did not err in its factual findings as to the amount of loss, nor did it err when it decided to enhance her offense level under the obstruction of justice adjustment based on her denial of the material fact that she recruited fictitious students.

### III. Conclusion

We AFFIRM the conviction, finding no error as to the use of the ostrich instruction; and, we AFFIRM the sentence, finding no error in the district court's calculation.