In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-1832

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

CHRISTIAN GONZALEZ,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 10 CR 1063 — **Matthew F. Kennelly**, *Judge.*

ARGUED DECEMBER 2, 2013 — DECIDED DECEMBER 16, 2013

Before BAUER and FLAUM, *Circuit Judges,* and
VAN BOKKELEN,[*] *District Judge.*

BAUER, *Circuit Judge.* A grand jury returned an indictment
charging Christian Gonzalez with conspiring to possess with
intent to distribute 1,000 kg or more of marijuana in violation
of 21 U.S.C. § 846, and possession with intent to distribute

[*] Of the United States District Court for the Northern District of Indiana,
sitting by designation.

more than 1,000 kg of marijuana in violation of 21 U.S.C.
§ 841(a)(1). At trial, Gonzalez moved for judgment of acquittal
at the close of the government's case and again at the close of
the evidence. The district court denied both motions. The jury
returned a verdict of guilty on the conspiracy count and
not guilty on the possession count. After the jury's verdict,
Gonzalez filed a third motion for judgment of acquittal; this
time, the district court granted Gonzalez's motion and Gonza-
lez was released. The government now appeals and seeks
reinstatement of the jury's verdict.

## I.  BACKGROUND

### A.  Activities at the Warehouse

In November 2010, law enforcement intercepted six railcars
as they crossed from Mexico into the United States. They
discovered that the railcars contained large amounts of
marijuana, which had been packed into bricks. The marijuana
bricks were encased in colored clay shells and hidden inside
large bags called "super sacks." The super sacks were labeled
"Made in Mexico" and were filled with a colored, clumpy
powder. The powder varied in color; about half the super sacks
contained red powder, while the other half contained orange,
yellow, and brown powder. Each sack contained eight to
sixteen marijuana bricks and weighed approximately 2,550
pounds. After law enforcement officials discovered the
marijuana, they followed the railcars to their final destination:
a warehouse in Chicago Heights, Illinois.

Agents conducted surveillance of the warehouse to identify
the intended recipients of the shipment. They stationed agents
outside the warehouse, employed court-ordered telephone

wiretaps, and installed cameras inside and outside the warehouse. The agents determined that Carlos Osvaldo Quintero ("Quintero") ran the Chicago end of the drug trafficking operation. They watched and listened as Quintero and his associates, including Christian Gonzalez ("Gonzalez"), unloaded the marijuana-filled super sacks from the railcars and placed them inside the warehouse.

During the unloading process, Gonzalez called Quintero and expressed concern because an unknown man seemed to be inspecting the super sacks. He left a message for Quintero, saying, "Some white dude came … he was lookin' at all the bags … [h]e was lookin' at it." Four minutes later, Quintero called Gonzalez back and told him the man owned the warehouse. However, he said that Gonzalez's decision to call him about the man's presence was "a good one."

After unloading was complete, Gonzalez and Quintero arranged to meet to discuss work that still needed to be done. Agents watched as Quintero met with Gonzalez and Javier Vera ("Vera") inside a department store. A fourth man seemed to be conducting surveillance of the group and watching to make sure that no one approached them. The man then joined Quintero, Gonzalez, and Vera.

A few days later, an industrial-sized funnel was delivered to the warehouse. Agents used cameras to watch what transpired. Gonzalez and several other men spent the bulk of the day working to raise up the funnel so that the super sacks could fit beneath it. They also spent time taping together cardboard boxes. Agents also conducted surveillance of the

warehouse's exterior; at times, they saw Gonzalez and two other men peering outside the warehouse.

Two days later, a white van delivered an empty funnel-like sifting device to the warehouse. A few hours after the machine was delivered, the warehouse owner returned to the warehouse. Vera called Quintero and told him, "Hey, the … white guy['s] … checking out the warehouse[] … he went inside." Quintero told Vera to use a cover story to get the white man out of the warehouse. He said, "If he goes over there just … make a conversation with 'em and try to get him outta' that warehouse." Due to concerns that the man would find out what they were up to, Gonzalez and the other men moved the sifting machine to a more secluded spot in the south bay of the warehouse.

Cameras were not set up in the south bay of the warehouse, so agents could no longer see the sifting device. They surmised, however, that Gonzalez and the other men used the machine to separate the marijuana bricks from the clumpy powder contained in the super sacks. First, a forklift was used to raise super sacks above the sifting machine. A sack's contents were then dumped inside the machine. The motor-operated machine contained two augers, which drilled into the clumpy powder in order to separate the marijuana bricks from the rest of the powder. An empty super sack was placed beneath the machine to catch the residual powder. The bricks were then removed.

Later that day, agents arrested Gonzalez and the other men as they left the warehouse. The men were literally caught red-handed; they were covered from head to toe in red powder.

Agents then searched the warehouse. They found the sifting device, which was now filled with red powder. They found a forklift with a super sack suspended from its forks. They recovered hundreds of super sacks, all covered in red powder, as well as some cardboard boxes. Agents also found eight marijuana bricks stacked in the back of the warehouse. The bricks were covered in red powder and appeared as if they had been extracted from a super sack. In total, agents recovered 8,752 kg of marijuana that had been packed into bricks and hidden inside the super sacks.

### B.  Gonzalez's Interview

After his arrest, Gonzalez was questioned by agents. He gave a two-and-one-half hour statement to agents, which was played for the jury. During the interview, Gonzalez admitted that he helped to unload the super sacks and to construct cardboard boxes, but denied knowing what was inside the super sacks or why the cardboard boxes were being assembled. He admitted to becoming suspicious and stated that he asked Quintero what the super sacks contained. He asked, "Is it yay,[1] it could be yay, or [] weed?" Quintero responded, "No I don't know dog, I don't, I really don't know I seriously don't know." Gonzalez then replied, "Alright cool man I guess."

Though Gonzalez may not have definitively known that there were illegal drugs in the super sacks, he admitted that his "gut" told him it was probably cocaine. He stated in his interview with agents, "[w]ell to me, like how I was thinking, damn that's probably drugs, probably … because it came from

---

[1]  "Yay" is a slang term for cocaine.

Mexico … . I know there was shit in there." Because he was
suspicious, he looked inside several of the sacks. He removed
three black garbage bags from one of the super sacks, but
found no marijuana or illegal drugs inside. He did, however,
admit that he saw several bricks lying on the floor of the
warehouse and thought they were cocaine.

### C. Gonzalez's Trial

After the close of all the evidence presented at trial,
Gonzalez made a motion for judgment of acquittal. The court
denied it, saying,

> I have to look at the evidence in the light most
> favorable to the government and determine whether
> any reasonable juror could find what it needs to find
> in order to convict Mr. Gonzalez. And I think it
> could. Number one, there's evidence that [Gonzalez]
> was involved, and I won't get into any more detail
> on that, in unloading and extracting the bundles.
> Number two, at least from his statement, if not from
> other things other than the statement, and I ac-
> knowledge that it's subject to interpretation, but
> looking at it in the light most favorable to the gov-
> ernment, which is the standard, you know, a person
> could conclude that either [Gonzalez] knew that [the
> super sacks] contained a controlled substance or
> that, in the words of the instruction that I'm going to
> give, that he believed that there was a strong proba-
> bility about that and took deliberat[e] actions to
> avoid learning the actual truth.

The district court gave the "ostrich instruction" to the jury over Gonzalez's objection, explaining, "in Mr. Gonzalez's interview there's at least two … references where he talks about being suspicious … it's almost a classic case for the ostrich instruction." The court instructed the jury as follows:

> You may find that a defendant acted knowingly if you find beyond a reasonable doubt that he believed there was a strong probability that controlled substances were in the super sacks but took deliberate actions to avoid learning the truth. You may not find that the defendant acted knowingly if he was merely mistaken or careless in not discovering the truth, or if he failed to make an effort to discover the truth.

After the case was submitted to the jury, the jury returned a verdict of guilty on the conspiracy count, and not guilty on the possession count.

### D. Gonzalez's Motion for Judgment of Acquittal After the Jury's Verdict

After the jury's verdict, Gonzalez moved for judgment of acquittal once again. This time, the district court granted Gonzalez's motion for judgment of acquittal. It found that "no reasonable jury could have found that Gonzalez had the requisite knowledge" that drugs were involved. The court concluded that "taking the evidence as a whole … the government failed to prove actual knowledge" and no reasonable jury could have found evidence sufficient to support a finding of deliberate avoidance. The district court acknowledged that the "evidence, taken in the light most favorable to the government, certainly established that [Gonzalez] handled or saw

several of the bricks." It also concluded that Gonzalez's assistance in putting together cardboard boxes was "certainly evidence that he was aware that something from the super sacks was going to be boxed up and carried away," a factor that Gonzalez admitted made him "suspicious." However, the court found that the inferences drawn by the jury were "a stretch" and went "beyond the bounds of reasonable inference." The government filed a timely appeal to this court.

## II. DISCUSSION

We review a district court's grant of a motion for judgment of acquittal *de novo. United States v. White,* 698 F.3d 1005, 1013 (7th Cir. 2012). A jury's verdict is entitled to great deference; a district court should not "reweigh the evidence or second-guess the jury's credibility determinations." *Id.* at 1013 (quoting *United States v. Tavarez,* 626 F.3d 902, 906 (7th Cir. 2010)). As long as the evidence is sufficient, "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Coleman v. Johnson,* 132 S. Ct. 2060, 2062 (2012) (quoting *Cavazos v. Smith,* 565 U.S. 1 (2011)). A jury's verdict should be set aside only if "the record contains no evidence, regardless of how it is weighed, from which a jury could have returned a conviction." *White,* 698 F.3d at 1013 (quoting *United States v. Moses,* 513 F.3d 727, 733 (7th Cir. 2008)).

"To sustain a conspiracy conviction, the Government must provide substantial evidence that a conspiracy existed and that the defendant knowingly agreed to join that conspiracy." *United States v. Monroe,* 73 F.3d 129, 131 (7th Cir. 1995) (citing *United States v. Carson,* 9 F.3d 576, 587 (7th Cir. 1993)). A

conspiracy requires "substantial evidence that the defendant knew of the illegal objective of the conspiracy and agreed to participate." *United States v. Longstreet,* 567 F.3d 911, 918–19 (7th Cir. 2009) (quoting *United States v. Thornton,* 197 F.3d 241, 254 (7th Cir. 1999)). "A conspiracy need not be proved with direct evidence; circumstantial evidence is sufficient." *United States v. Carrillo*, 435 F.3d 767, 776 (7th Cir. 2006) (citing *United States v. Miller*, 405 F.3d 551, 555 (7th Cir. 2005)). To sustain a conviction, a defendant need not have known the specific drug type or quantity as long as he was aware that a controlled substance was involved. *United States v. Gougis,* 432 F.3d 735, 745 (7th Cir. 2005).

At Gonzalez's trial, the trial court gave the ostrich instruction to the jury. "The purpose of the ostrich instruction 'is to inform the jury that a person may not escape criminal liability by pleading ignorance if he knows or strongly suspects he is involved in criminal dealings but deliberately avoids learning more exact information about the nature or extent of those dealings.'" *United States v. Craig,* 178 F.3d 891, 896 (7th Cir. 1999) (quoting *United States v. Rodriguez*, 929 F.2d 1224, 1227 (7th Cir. 1991)). It is appropriate to give the ostrich instruction where the defendant claims a lack of guilty knowledge, and the government presents evidence from which a jury could conclude that the defendant deliberately avoided learning the truth. *United States v. Carani*, 492 F.3d 867, 873 (7th Cir. 2007).

"For purposes of criminal liability, deliberately avoiding knowledge of a criminal activity is the same thing as having actual knowledge of that activity." *Carrillo,* 435 F.3d at 780 (citing *United States v. Ramsey*, 785 F.2d 184, 189 (7th Cir. 1986)). "Deliberate avoidance is not a standard less than knowledge;

it is simply another way that knowledge may be proven." *Carani,* 492 F.3d at 873. Deliberate avoidance can be demonstrated either by the defendant's "overt physical acts," or by the defendant "cutting off [his] normal curiosity by an effort of will." *Craig,* 178 F.3d at 896 (quoting *United States v. Stone,* 987 F.2d 469, 472 (7th Cir. 1993)).

In *Rodriguez,* 929 F.2d at 1229, we affirmed the defendants' convictions for conspiracy to distribute cocaine. Two brothers, Lino and Evelio Rodriguez, drove to a location where a drug transaction was set to take place. *Id.* at 1226. Lino removed a white plastic bag from his trunk and set it on the passenger seat of his vehicle. *Id.* The plastic bag was then picked up by Evelio and handed to an undercover officer. *Id.* The undercover officer checked the contents of the bag and confirmed it was cocaine. *Id.* He then gave a signal to other officers to arrest Lino. *Id.* After he was arrested, Lino claimed he knew nothing about the cocaine transaction, and asserted that he was "just helping someone else" and "trying to make some money." *Id.* at 1227. The jury convicted him. *Id.* We affirmed his conviction, explaining that it would not have been "unreasonable for the jury to conclude from all this that [Lino's] failure to ask for more details was an attempt to avoid learning exactly what he was participating in—'a cutting off of one's normal curiosity by an effort of will.'" *Id.* at 1228 (quoting *United States v. Giovanetti,* 919 F.2d 1223, 1229 (7th Cir. 1990)).

Much like Lino in *Rodriguez,* Gonzalez actively avoided learning that drugs were present in the super sacks, because he did not want to know the truth. Portions of Gonzalez's post-arrest statements make clear that Gonzalez strongly suspected that the super sacks contained controlled substances. He

stated, "I was thinking, damn that's probably drugs … . I know there was shit in there." He admitted seeing several bricks in the warehouse and acknowledged that his "gut" told him illegal drugs were probably involved. At one point he asked Quintero if drugs were involved, saying, "Is it yay, it could be yay, or [] weed?" but Quintero merely responded, "No I don't know dog, I don't, I really don't know I seriously don't know." Gonzalez, however, did not press for clarification when he did not get a definitive answer from Quintero, nor did he stop working for Quintero. Instead, Gonzalez "cut[] off [his] normal curiosity" and continued working for Quintero in "an attempt to avoid learning exactly what he was participating in." *Id*. at 1228.

Though Gonzalez may not have definitively known that there were illegal drugs in the super sacks, he cannot "escape criminal liability by pleading ignorance if he knows or strongly suspects he is involved in criminal dealings but deliberately avoids learning more exact information about the nature or extent of those dealings.'" *Craig,* 178 F.3d at 896 (quoting *Rodriguez*, 929 F.2d at 1227).

### III. CONCLUSION

We are satisfied that the evidence was sufficient for a jury to reasonably conclude that Gonzalez knew that the super sacks contained illegal drugs and yet continued to participate in the super sacks operation. At the very least, there is evidence that Gonzalez strongly suspected the super sacks contained illegal drugs but deliberately avoided learning the truth. Therefore, we REVERSE the decision of the district court and

REMAND the case to the district court with orders to reinstate the jury's verdict.